# Exhibit B

Western Conference of Teamsters Pension Trust Fund, and no Loan Party is a participating employer in the Western Conference of Teamsters Pension Trust Fund.

4.17  **Solvency**. As of the date hereon, neither Borrower nor any other Loan Party is insolvent and there has been no: (a) assignment made for the benefit of the creditors of any of them; (b) appointment of a receiver for any of them or for the property of any of them; or (c) bankruptcy, reorganization, or liquidation proceeding instituted or contemplated by or against any of them.

4.18  **Financial Condition; No Change**. Borrower has heretofore delivered to Lender copies of the most current financial statements of Borrower and Owner. Such financial statements present fairly the financial condition of Borrower, Owner and Guarantors, as applicable, as of the dates in question. Since the dates of such statements, there has been no material adverse change in the structure, business operations, credit, prospects or financial condition of Borrower, Owner or the Property and no event that would constitute an Event of Default under Section 8.1(k). To Borrower's knowledge, the Estimated Collateral Value Statement for each Guarantor accurately lists the Available Assets (as defined in the Carve-Out Guaranty) of such Guarantor as of the date of such Estimated Collateral Value Statement and the value as of the date of such Estimated Collateral Value Statement of such Available Assets calculated on the basis provided in the notes thereto.

4.19  **Single Asset Entity**. Neither Borrower nor Owner (a) holds, directly or indirectly, any ownership interest (legal or equitable) in any real or personal property, other than the Property and personal property used in connection with the construction or operation of the Property and ancillary or related assets and the Collateral; (b) is a shareholder or partner or member of any other Person; (c) conducts any business other than the ownership, development, management and operation of the Property and ancillary or related businesses and the Collateral; (d) has made or will make any loans or advances to any third party or Affiliate of any Loan Party who is not an individual; (e) has failed to do or will fail to do anything necessary to preserve its existence or has failed to, or will fail to, observe all applicable corporate or partnership formalities necessary to maintain its existence; (f) has failed or will fail to conduct its business in its own name and as presently conducted; (g) has failed or will fail to maintain financial statements, books and records and bank accounts separate from those of its Affiliates who is not an individual or has failed or will fail to file its own tax returns; (h) has failed to be, or will fail to hold itself out to the public as, a legal entity separate and distinct from any other entity (such as its Affiliates); (i) has failed or will fail to allocate fairly and reasonably any overhead and expense for office space shared with its Affiliates; (j) has commingled or will commingle its assets with assets of its Affiliates or any other Persons; (k) has failed or will fail to maintain its assets in a manner such that its individual assets can be segregated and identified from those of any of its Affiliates or any other Person without undue cost or difficulty; (l) has held or will hold itself out as responsible for any other Person's debts or obligations; (m) has failed or will fail to pay any liabilities, including salaries of its employees, if any, out of its own funds and not funds of any of its Affiliates; (n) has failed or will fail to maintain relationships comparable to an arm's-length transaction with its Affiliates and to enter into transactions with its Affiliates only on a commercially reasonably basis and on terms similar to those of an arm's-length transaction; (o) has failed or will fail to comply with and observe in all material respects the Delaware Act and organizational formalities in order to maintain its separate existence; (p) has failed or will

fail to maintain its books, records, resolutions and agreements as records of the applicable Person; (q) has formed, acquired or held an interest in any subsidiary (other than Owner) or will form, acquire or hold an interest in any subsidiary (other than Owner); (r) has sought, effected or caused, or will seek, effect or cause any constituent party to seek or effect, the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, or the sale of substantially all of the assets of Owner or Borrower, except for the sale of Units, parking spaces and storage spaces in accordance with the terms of this Agreement; (s) has funded and will not fund the operations of any of its Affiliates (except Owner) or pay their expenses; and (t) has kept and will keep careful records of all transactions by and between Owner, Borrower and their Affiliates and has documented and will document all such transactions and all payables to such Persons completely and accurately.

4.20   **No Broker.**  No brokerage commission or finder's fee is owing to any broker or finder arising out of any actions or activity of any Loan Party in connection with the Loan.

4.21   **Leases.**  None of Owner, Borrower and any agent or either of them has entered into any lease or other arrangements for occupancy of space for any portion of the Property other than Leases approved in writing by Lender.

4.22   **No Event of Default.**  No Event of Default under this Agreement or any of the other Loan Documents has occurred and is continuing.

4.23   **RICO.**  None of the Loan Parties has been charged with nor, to Borrower's knowledge, is any of them under investigation for, possible violations of the Racketeer Influenced and Corrupt Organizations Act, the Continuing Criminal Enterprise Act, the Controlled Substance Act of 1978, or similar laws providing for the possible forfeiture of any of its respective assets or properties.  Neither Borrower nor Owner has purchased any portion of the Property or interest therein with the proceeds of any illegal activity.  No Loan Party has acquired an interest in Owner or Borrower with the proceeds of any illegal activity.

4.24   **No Set-Off.**  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Loan Party, including the defense of usury, other than any such defense attributable to Lender's express behavior, nor would the exercise of any of the terms of the Loan Documents, or the exercise of any rights thereunder, render the Loan Documents unenforceable.

4.25   **Priority of Liens.**  The Pledge Agreement creates a valid and enforceable first priority lien on the Collateral described therein in favor of Lender.  Other than the UCC financing statements granted in favor of Lender pursuant to the terms of this Agreement, neither Owner nor Borrower has granted any UCC financing statements in favor of any other secured party related to the Collateral or, except pursuant to the Senior Loan Documents, the Property.

4.26   **Environmental Reports.**  Except as set forth in the environmental reports listed in Schedule 4.26 (the "**Environmental Reports**"), no Loan Party has any knowledge of any adverse environmental condition or circumstance affecting the Property, which it has not disclosed in writing to Lender.

4.27 **Construction Documents.** Borrower has furnished Lender with a true, correct and complete copy of each of the Construction Documents.

4.28 **Construction Budget and Sources and Uses.** The amounts set forth in the Construction Budget present, as of the date hereof, a true, full and complete itemization by category of all costs, expenses and fees which Borrower or Owner expects to pay or anticipates becoming obligated to pay to Complete the Improvements and to pay all interest, fees and other amounts due in connection with the Senior Loan until Completion.

4.29 **Labor Relations.** Neither Borrower nor Owner is engaged in any unfair labor practice. There is (i) no unfair labor practice complaint pending against Borrower or Owner or, to the best knowledge of Borrower, threatened against either of them before the National Labor Relations Board, (ii) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement pending against Borrower or Owner or threatened against either of them, (iii) no strike, labor dispute, slowdown or stoppage pending against Borrower or Owner, and (iv) no question concerning union representation existing with respect to employees of Borrower or Owner.

4.30 **Intellectual Property.** Borrower or Owner owns or holds licenses or other rights to or under all the patents, patent applications, trademarks, service marks, trademark and service mark registrations and applications therefor, trade names, copyrights, copyright registrations and applications therefor, trade secrets, proprietary information, computer programs, data bases, licenses, permits, franchises and formulas, or rights with respect to the foregoing which are necessary to the operation of the business of Borrower or Owner and the absence of which might materially and adversely affect the business, affairs, assets or financial condition of Borrower, Owner or the Property (collectively, "**Intellectual Property**"), without any known material conflict with the rights of others. Borrower has no knowledge of any existing or threatened claim by any Person contesting the validity, enforceability, use or ownership of the Intellectual Property, or of any existing state of facts that would support a claim that use by Borrower or Owner of any such Intellectual Property has infringed or otherwise violated any proprietary rights of any other Person, which could reasonably be expected to have a material adverse effect with respect to the Property, Borrower or Owner.

4.31 **OFAC Compliance.** Borrower will not permit the transfer of any direct interest in Borrower, Owner or any other Loan Party to any person or entity (or any beneficial owner of such entity) who is listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of Office of Foreign Asset Control, Department of the Treasury or pursuant to any other applicable Executive Orders (such lists are collectively referred to as the "**OFAC Lists**"). Borrower will not knowingly enter into or knowingly permit Owner to enter into a lease, contract or other agreement with any party who is listed on the OFAC Lists. Borrower shall immediately notify Lender if Borrower has knowledge that any owner of a direct interest in Borrower is listed on the OFAC Lists or (A) is indicted on or (B) arraigned and held over on charges involving money laundering or predicate crimes to money laundering. Borrower shall immediately notify Lender if Borrower knows that any tenant is listed on the OFAC Lists or (A) is convicted on, (B) pleads

nolo contendere to, (C) is indicted on or (D) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. Borrower further represents and warrants to Lender that neither Borrower nor any other Loan Party is currently listed on the OFAC Lists.

4.32 **Constituent Documents**. "Constituent Documents" mean collectively, the Declaration, any and all applications for registration, public offering statements, master deed, bylaws of the Association, and other equivalent documents related to the condominium regime for the Property. Borrower represents and warrants to Lender that the Constituent Documents shall comply with all applicable government laws, ordinances, codes, rules, regulations, orders and decrees, including any applicable zoning, use, environmental protection, and other building laws, ordinances or regulations applicable thereto.

4.33 **Additional Agreements**. Borrower represents and warrants to Lender that it has complied with or received written waivers for all terms of the Land Disposition Agreement, the Cooperation Agreement and the Transportation Agreement, to be met on or before the date of this Agreement and has provided Lender with a copy of each such written waiver.

## ARTICLE 5 - BORROWER'S COVENANTS

5.1 **Payment of Indebtedness; Performance of Obligations**. Borrower shall promptly pay the Indebtedness when due and shall promptly perform all other obligations of Borrower to Lender.

5.2 **Taxes and Other Obligations**. Except as expressly permitted by the term of this Section 5.2, Borrower shall pay all Charges, when due, and before any interest, collection fees or penalties shall accrue thereon. Borrower shall have the right to contest, or cause others to contest, in good faith by appropriate proceedings, the amount or validity of any such Charges, so long as: (a) Borrower has given prior written notice to Lender of Borrower's intent to so contest or object to (or cause to be so contested or objected to) any such Charges that are material; (b) Borrower or such other Person, as applicable, is permitted to contest the same under the Senior Loan Documents, (c) such contest stays the enforcement or collection of the Charges or any lien created; and (d) the Charges or lien created are bonded or insured over by the Title Company or Borrower has posted security therefor in accordance with the provisions of the Senior Loan Documents and in a manner reasonably acceptable to Lender. Upon the request of Lender, Borrower shall immediately furnish to Lender all notices of amounts due for all Charges and receipts evidencing payment for all Charges not being contested by Borrower. Borrower shall promptly notify Lender of any lien on all or any part of the Property and shall promptly discharge any unpermitted lien or encumbrance.

5.3 **Insurance**. Borrower shall cause Owner to keep the Property insured as is required by the Senior Loan Documents. Regardless of the requirements of the Senior Lender, Borrower shall cause Owner's insurance to include (i) an "all risk" form of builder's risk insurance in the full replacement cost of the Improvements (including "all risk" coverage for flood and/or surface water insurance) with Lender's interest protected under a loss payee clause, (ii) a policy of commercial general liability insurance (occurrence form) having a limit of not less than $1,000,000 per single occurrence, $2,000,000 aggregate, (iii) comprehensive

automobile liability insurance having a combined single limit of not less than $1,000,000 and (iv) an umbrella policy of commercial general liability insurance having a limit of not less than $10,000,000. Such insurance policies shall be issued by insurance companies with a rating of not less than A- Class VIII in the latest edition of Best's Insurance Guide. Borrower shall cause Owner to maintain the Environmental Policy. Lender shall be a named insured party on the liability insurance policy and the Environmental Policy, and Borrower shall deliver to Lender certified copies of such insurance policies, together with certificates evidencing the coverage of Lender under the liability policy and the Environmental Policy promptly upon issuance or renewal thereof. Promptly following issuance thereof, Borrower shall deliver to Lender true, correct and complete copies of all such insurance policies. All policies must require the insurance carrier to give Lender a minimum of thirty (30) days' notice in the event of modification or cancellation. In case of loss or damage by fire or other casualty, Borrower shall give written notice thereof to the insurance carrier(s) and to Lender within five (5) days of the date of such loss, damage or casualty.

    5.4    **Escrows.**

        (a)    Following the occurrence of an Event of Default, if not so established and held with Senior Lender, Borrower shall establish a real estate tax and assessment escrow and an insurance escrow with Lender in accordance with the terms of this Section 5.4. On the first day of each calendar month Borrower shall deposit into such escrow one-twelfth (1/12) of the annual real estate taxes and assessments and the annual insurance premiums for the Property, each as estimated by Lender. If at any time following the occurrence of an Event of Default, there are insufficient funds in either such escrow, when added to such monthly escrow payments, to pay the next due real estate tax and assessment invoices or insurance premiums, as the case may be, for the Property, immediately upon Lender's request Borrower shall deposit into the applicable escrow an amount equal to such deficiency.

        (b)    The escrows established pursuant to the terms of Section 5.4(a) are hereby pledged as additional security for the Loan and shall be held to be irrevocably applied for the purposes for which made hereunder and shall not be subject to the direction or control of Borrower; provided, however, that neither Lender nor any depositary holding such funds shall be liable for any failure to apply to the payment of taxes and assessments, or insurance premiums any amount so deposited unless (i) Borrower shall have requested Lender in writing to make application of such funds to the payment of the particular taxes or assessments or the payment of the particular insurance premiums as the case may be, accompanied by the bills for such taxes and assessments or insurance premiums, (ii) there shall exist no default or Event of Default hereunder or under any of the Loan Documents, (iii) there are sufficient funds in the such escrows to pay the particular taxes, assessments, or insurance premiums, and (iv) following payment of such taxes, assessments, or insurance premiums, such escrows will be "in balance" in the reasonable opinion of Lender.

5.5 **Condemnation.** Borrower shall within three (3) business days of its receipt of notice thereof, notify Lender of any pending or threatened action or proceeding relating to any condemnation or other taking of the Property, or part thereof, and after consultation with and subject to Lender's written approval, Borrower shall appear in and prosecute, or cause Owner to appear in and prosecute, any such action or proceeding and/or settle or compromise any claim in connection therewith.

5.6 **Preservation and Maintenance of the Property.** Borrower shall: (a) not commit or permit Owner to commit waste or permit or allow Owner to permit impairment or deterioration of the Property; (b) not abandon or permit Owner to abandon the Property; (c) after Completion, keep and cause Owner to keep the Property in good repair and restore or repair or cause Owner to restore and repair promptly, in a good and workmanlike manner, all or any part of the Property that suffers a casualty loss to the equivalent of its condition after Completion of construction; and (d) give notice in writing to Lender of and, unless otherwise directed in writing by Lender, cause Owner to appear in and defend any action or proceeding purporting to affect the Property, the security granted by the Loan Documents or the rights or powers of Lender. Borrower shall not (and shall not permit Owner to) remove, demolish or alter any improvement on the Land except when incident to Completion and to the extent contemplated by the Construction Documents or to the extent required to perform tenant improvement work to a tenant's space as required by the terms of the applicable Lease or as a closing condition under a Qualified Sale Contract. Borrower shall promptly (and shall cause Owner promptly to) comply with all applicable Laws having jurisdiction over Borrower, Owner or the Property, and shall take all actions necessary to bring the Property into compliance with all applicable Laws (whether now existing or hereafter enacted). Borrower shall not seek, cause or consent to changes in the plat of subdivision, zoning classification or use of any part of the Property without Lender's prior written consent.

5.7 **Lienable Work.** After Completion, no excavation, construction, earth work, site work or any other mechanic's lienable work shall be done to or for the benefit of the Property, without Lender's approval, except for tenant improvements under Leases, interior buildouts and custom work in Units to the extent required by a Qualified Sale Contract, and normal repair and maintenance in the ordinary course of business.

5.8 **Personal Property.** Following Completion, no Loan Party and no Affiliate of any Loan Party shall, without the prior written consent of Lender, Transfer (except through encumbrances, if any, permitted under the Loan Documents), remove or permit to be removed from the Property any Personal Property, with the exception that (i) so long as no Event of Default exists, Owner may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Property, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property and (ii) Personal Property related to a residential or retail Unit, parking space or storage space in the Property may be Transferred with such Unit, parking space or storage space.

5.9 **Leases.** Borrower shall not without Lender's prior written consent (i) enter into or permit Owner to enter into a lease for any portion of the retail portion of the Property, or modify, amend, waive any material provision of, terminate or cancel (or permit Owner to do any

of the foregoing with respect to) any Lease of retail space in the Property or (ii) enter into (or permit Owner to enter into) a Lease for any Unit, or modify, amend, waive any material provision of, terminate or cancel (or permit Owner to do any of the foregoing with respect to) any Lease of a Unit. All lessees of retail space in the Property shall be required at Lender's election to execute estoppel certificates in form and substance reasonably satisfactory to Lender.

5.10   **Property Manager.** This Section 5.10 shall apply to the extent Borrower or Owner (as distinguished from the Association), enters into any management contract for all or a part of the Property. Such management contract shall be subject to Lender's prior written consent, not to be unreasonably withheld. From and after the Completion, Borrower shall not change (or permit to be changed) the Property manager or amend or terminate the management contract (or permit any of the foregoing) for the Property without Lender's prior written consent, which shall not be unreasonably withheld. Any management agreement entered into with respect to the Property shall provide Owner with the right to terminate such management agreement after the occurrence of an Event of Default, without any penalty or fee (other than accrued and unpaid fees thereunder), upon the earlier of thirty (30) days' prior written notice or the effective date of any new management agreement with a new manager entered into in accordance with the terms hereof. Upon the occurrence of an Event of Default, if requested by Lender in writing (a **"Lender Termination Request"**), Borrower shall cause Owner to issue within five (5) days after delivery of the Lender Termination Request, a notice of termination to terminate the management agreement (a **"Manager Termination Notice"**). Notwithstanding the foregoing, if a manager is an Affiliate of Borrower or any other Loan Party, Lender's delivery to Borrower of a Lender Termination Request after an Event of Default exists shall automatically terminate the management agreement effective as of the date specified in the Lender Termination Request so long as permitted by the Senior Loan Documents. If the manager is not an Affiliate of Borrower or any other Loan Party, unless prohibited by Senior Lender, Borrower shall cause Owner to appoint a replacement manager satisfactory to Lender and Senior Lender pursuant to a new management agreement within thirty-five (35) days after delivery of such Lender Termination Request, and shall cause such manager to execute and deliver to Lender a subordination of management agreement satisfactory to Lender. If Borrower fails to issue the Manager Termination Notice within said five (5) day period, then Lender shall have the right, and Borrower hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to issue a Manager Termination Notice on behalf of and in the name of Borrower unless prohibited by Senior Lender, and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority. Notwithstanding the foregoing, all of the terms contained in this Section 5.10 shall be subject to (i) the terms of applicable condominium laws and (ii) rights of the Senior Lender.

5.11   **Inspection.** Lender and its authorized agents may enter upon and inspect the Property at all reasonable times upon notice given orally or in writing. Lender, at Borrower's expense, shall retain Lender's Consultant to periodically inspect the progress of construction of the Property and all documents, drawings, plans, and consultants' reports relating thereto. Lender shall have the right (i) to discuss and provide advice with respect to the Property with Borrower's and Owner's officers, employees, directors and agents and the right to consult with and advise Borrower's and Owner's senior management on matters materially affecting the Property, and (ii) to submit business proposals or suggestions relating to the Property to

32

Borrower's and Owner's senior management from time to time with the requirement that one or more members of Borrower's and Owner's senior management discuss such proposals or suggestions with Lender within a reasonable period after such submission and the right to call a meeting with Borrower's and Owner's senior management in order to discuss such proposals or suggestions. Borrower agrees that it will give and cause Owner to give due consideration to such input as may be provided by Lender from time to time.

5.12  **Books and Records/Audits.** Borrower shall keep and maintain at all times at Borrower's address stated below, or such other place Borrower identifies in written notice to Lender, complete and accurate books of accounts and records adequate to reflect the results of the operation of the Property and agrees to provide to Lender the financial statements required to be provided to Lender pursuant to Section 5.13 of this Agreement and, upon Lender's request, copies of all written contracts, correspondence, reports of Senior Lender's independent consultant (if received by Owner or Borrower), the Construction Documents and other documents affecting the Property. Lender and its designated agents shall have the right to inspect and copy any of the foregoing. Additionally, Lender may audit and determine, in Lender's reasonable discretion, the accuracy of Borrower's records and computations. If an Event of Default has occurred prior to any such audit, Borrower shall pay all reasonable expenses of any such audit, which expenses shall be immediately due and payable with interest thereon at the default rate contained in the Note. If any such audit reveals that any such book, record or statement is incomplete or inaccurate in any material respect as determined in Lender's reasonable discretion or that an Event of Default has occurred hereunder, then Borrower shall also pay all reasonable expenses of any such audit, which expenses shall be immediately due and payable with interest thereon at the default rate contained in the Note.

5.13  **Financial Statements; Balance Sheets.** Borrower shall furnish to Lender the following financial statements:

>   (a)  Annual financial statements that accurately and fairly present the results of operations and the financial condition, including statements that show all material contingent liabilities, of each of Borrower and Owner at the dates and for the periods indicated and other financial information as Lender may from time to time reasonably request; and

>   (b)  Following Completion, statements of the operation of the Property (including with respect to the retail space, a current rent roll, monthly operating statements, monthly delinquency reports and a monthly schedule of delinquency of receipts and payments) as of the last day of each month, to be delivered within twenty (20) days after the end of each month, and yearly statements as of the last day of each fiscal year, to be delivered within ninety (90) days after the end of each fiscal year.

The annual statements required above shall be reviewed by independent certified accountants approved by Lender and be accompanied by a statement from such accountant that no irregularities, which would make such statements materially misleading, were noted. In addition, all of the statements required hereinabove shall be accompanied by a certificate of Borrower and Owner signed by a duly authorized financial officer stating on behalf of Borrower and Owner

that such statements (i) are true, correct and complete in all material respects, (ii) are prepared on a modified cash basis, and (iii) fairly present the financial conditions of the Persons referred to therein as of the dates indicated. If Borrower fails to furnish or cause to be furnished promptly any report required by this Section 5.13, or if Lender reasonably deems such reports to be unacceptable, Lender may elect (in addition to exercising any other right and remedy) to conduct an audit of all books and records of Borrower and Owner which in any way pertain to the Property or the Collateral and to prepare the statement or statements which Borrower failed to procure and deliver. Such audit shall be made and such statement or statements shall be prepared by an independent firm of certified public accountants to be selected by Lender. If an Event of Default shall have occurred prior to such audit, Borrower shall pay all reasonable expenses of the audit and other services, which expenses shall be immediately due and payable with interest thereon at the default rate contained in the Note. If any such audit reveals that any such book or record is incomplete or inaccurate in any material respect as determined in Lender's reasonable discretion or that an Event of Default has occurred hereunder, then Borrower shall also pay all reasonable expenses of any such audit, which expenses shall be immediately due and payable with interest thereon at the default rate contained in the Note

5.14    **Additional Reporting Requirements**. Except as otherwise approved by Lender, Borrower shall also furnish to Lender:

(a)    By the twentieth day of each month following the first month after a Qualified Sale Contract is executed, monthly reports certifying the number of Qualified Sale Contracts outstanding as of the last day of the preceding month; the names and addresses of the purchasers thereunder; the sales price (itemizing any portion of the Sale price attributable to upgrades, extras and options); the Unit under contract; the aggregate amount of earnest money deposited pursuant to each such Qualified Sale Contract into the escrow account maintained for such purpose, whether there are any defaults by Owner or, to Owner's or Borrower's knowledge, the purchaser under any such Qualified Sale Contract and whether, to Owner's or Borrower's knowledge, any event has occurred or is likely to occur which would cause a default to occur or give the purchaser a right to terminate or rescind its obligations thereunder; the number of Unit sales closed; the number and designation of the Units conveyed; the price paid for each such Unit and the amount of Net Sales Proceeds applied to repayment of the Senior Loan or the Loan; and the reports and matters set forth at (c) below;

(b)    On the first day of each week, a report on sales, leasing of Units and other marketing activity at the Property in such detail as may be reasonably required by Lender;

(c)    Within twenty (20) days following the last day of each calendar quarter (and at such other times as Lender may reasonably request), a list of all earnest money deposits under Qualified Sale Contracts and any other deposits, if any, made and disbursed from Borrower's deposit accounts;

(d)    A copy of each material report, statement, certification, claim, data, notice or other communication received, made or delivered by Borrower,

34

Owner or a purchaser under a Qualified Sale Contract that relates to events that may materially affect Borrower's, Owner's or such purchaser's obligations and/or performance under the terms of a Qualified Sale Contract or Borrower's, any other Loan Party's or any Affiliate of the foregoing obligations and/or performance under the Loan Documents or any Qualified Sale Contract, including the imposition of any penalties or damages, the exercise of any termination or cancellation rights, the filing of any dispute or litigation or the failure of Borrower, any other Loan Party or such purchaser to comply with any of the requirements of a Qualified Sale Contract. Any of the foregoing which affects the Qualified Sale Contracts or a material portion thereof shall be supplied by Borrower to Lender within five (5) days of occurrence or receipt; and

(e)     Upon the request of Lender at reasonable times and intervals in light of Borrower's normal business operations, such other information concerning the general status of Borrower's and Owner's business, financial condition and operations relating to the Property but only the extent such information is reasonably available to Borrower and in a format consistent with how Borrower maintains such information.

5.15    **Use of Loan and Senior Loan Proceeds; Distribution and Use of Cash Flow**.

(a)     No portion of the proceeds of the Loan or the Senior Loan shall be used by Borrower or Owner in any manner that might cause the borrowing or the application of such proceeds to violate Regulation G, Regulation U, Regulation T or Regulation X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Act of 1933 or the Securities Exchange Act of 1934.

(b)     Borrower shall apply and shall cause Owner to apply all Proceeds in accordance with Section 2.6 and thereafter to pay bona fide reasonable and customary Property expenses approved by Lender, including any other amounts due to Lender pursuant to the Loan Documents. Except as set forth in Section 2.6.1, no Proceeds shall be retained by, distributed or paid to the holders of any direct or indirect interests in Borrower, Owner or of any of their Affiliates or applied to the payment of any obligations, debts or expenses which are not customary and reasonable expenses incurred in connection with the ownership and operation of the Property, until the Senior Loan and the Loan have been repaid in full. Borrower shall not make and shall not permit Owner to make any loans to any party without the prior written consent of Lender. In the event that any Proceeds are not immediately applied to pay outstanding amounts under the Senior Loan and this Loan, any such Proceeds shall be deposited into an account in which the Lender has a security interest, such security interest to be subordinate to that of the Senior Lender.

5.16  **Notice of Litigation, Default or Equity Contribution.** Borrower shall promptly provide Lender with:

(a)  written notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's knowledge, threatened against or relating to Borrower, Owner, the Collateral or the Property, which if decided adversely could reasonably be expected to materially adversely affect the business, affairs, assets or financial condition of Borrower, Owner, the Property, the Collateral, the lien or the priority of the Pledge Agreement or the other Loan Documents, the prospects for repayment of the Loan or the performance of any other obligations of any of the Loan Parties under any of the Loan Documents;

(b)  a copy of all notices of default and violations of Laws received by Borrower or any of the other Loan Parties relating to the Collateral or the Property; and

(c)  written notice of any capital or other equity contributions to Borrower.

5.17  **Affiliate Transactions.** Except as set forth on Schedule 5.17, Borrower shall not enter into or permit Owner to enter into any agreement with any Loan Party or any Affiliate of any Loan Party or, except as permitted in Section 2.6.1, make any payment to any Loan Party or any such Affiliate, in each case without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed. If requested by Lender, such agreement shall provide Lender the right to terminate the same upon the occurrence of an Event of Default.

5.18  **No Commingling of Funds.** Borrower shall not commingle (and shall not permit to be commingled) the funds related to the Property with funds from any other property or source.

5.19  **Existence; Compliance with Legal Requirements.** Borrower shall, and shall cause Owner to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, and material rights, Permits and franchises and to comply in all material respects with all Laws.

5.20  **Change in Business.** Borrower shall not conduct and shall not permit Owner to conduct any business other than the construction, development and ownership of the Property. Borrower shall not make any change or permit Owner to make any change in the scope or nature of its business objectives, purposes or operations, or State of its organization, or undertake or participate in activities other than the continuance of its present business, without in each case Lender's prior written consent. Without limiting the foregoing, Borrower shall not conduct its business in a manner that would cause the representations in Section 4.19 to fail to be true and correct on a continuing basis. If Borrower requests Lender's consent to change the location of Borrower's or Owner's State of organization, Borrower shall deliver a written request to Lender at least thirty (30) days in advance, together with UCC financing statements for filing in the jurisdiction(s) in which Borrower or Owner desires to be organized, together with a legal opinion

that the filing of such financing statements in such jurisdictions will maintain the priority of Lender's perfected security interest in the Collateral.

5.21   **No Amendments of Organizational Documents.**   Borrower shall not, without Lender's prior written consent in each instance, suffer or permit the amendment, modification or termination of Borrower's Organizational Documents or the organizational documents of Owner, except to the extent necessary to implement any Transfers not prohibited by the Loan Documents. Borrower will not change its name or permit Owner to change its name in any manner which might make any financing or continuation statement filed in connection with the Loan Documents misleading unless Borrower shall have given Lender at least thirty (30) days prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Lender to amend such financing statement or continuation statement so that it is not misleading.

5.22   **Transfers of the Property or Beneficial Interests in Borrower.**   Without the approval of Lender, Borrower shall not Transfer or permit to be Transferred all or any part of the Property or any direct or indirect interest therein, except (i) for sales of residential and retail Units and parking and storage spaces on terms consistent with Sections 2.6 and 2.10, (ii) for Leases approved by Lender, and (iii) for liens and encumbrances created by the Senior Loan Documents and liens being contested to the extent permitted in, and in accordance with the terms of, this Agreement. Without the approval of Lender, neither Borrower nor any other Loan Party shall, directly or indirectly, (a) create or permit the creation of any new ownership interest in Borrower, Owner, General Partner or General Partner's General Partner, or (b) Transfer or permit the Transfer of, directly or indirectly all or any ownership interests in Borrower, Owner, General Partner or General Partner's General Partner (including any interest in profits, losses or cash distributions), except for Permitted Transfers. Notwithstanding anything to the contrary contained herein, one (1) or more of J. Ronald Terwilliger, William C. MacDonald, Joseph S. Torg and Timothy O'Connor shall at all times have control of Borrower, subject to such rights on the part of Limited Partner to approve certain specified actions as exist as of the date of this Agreement, and one (1) or more of Guarantors (or their transferees pursuant to subsection (i) - (iii) below) shall at all times own not less than eighty percent (80%) of the legal and beneficial interests in General Partner and General Partner shall at all times own not less than fifty percent (50%) of the legal and beneficial interests in Borrower. As used herein, **"Permitted Transfers"** shall be any of the following Transfers:  (i) Transfers to Immediate Family Members of Persons who, prior to the Transfer, hold an interest in Borrower, (ii) Transfers to any Person who, as of the date hereof, holds an interest in Borrower, and (iii) Transfers to any individual who is an active participant in the Trammel Crow Residential business, in each of the foregoing cases listed in items (i) through (iii) of this sentence, if and so long as copies of any and all documents evidencing any such Transfer, including a statement detailing the action and a listing of reallocations and percentages of ownership interests in Borrower, are provided to Lender within five (5) days following Lender's request therefor.

5.23   **No Additional Liens or Encumbrances.**   None of the Loan Parties shall grant or permit the filing of any lien or encumbrance on the Property or the Collateral, other than the encumbrances on the Property created by the Senior Loan Documents and the Encumbrances, without the prior written consent of Lender; provided, however, Borrower may or may permit

Owner to, by appropriate proceeding, contest the validity or amount of any asserted lien and, pending such contest, Borrower shall not be deemed to be in default hereunder if (a) Borrower has given prior written notice to Lender of Borrower's intent to so contest or cause such contest, (b) such contest stays the enforcement of the contested lien, (c) Borrower or Owner is permitted to contest such lien under the Senior Loan Documents, and (d) the contested lien is bonded or insured over by the Title Company or Borrower or Owner has posted security therefor in accordance with the provisions of the Senior Loan Documents and in a manner acceptable to Lender.

5.24   **No Additional Indebtedness.** Except as expressly permitted under this Agreement, Borrower shall not, without Lender's prior written consent, incur or permit Owner to incur additional indebtedness, except for trade payables in the ordinary course of business and obligations under interest rate hedges related to the Senior Loan.

5.25   **Nonexempt ERISA Transactions.** Borrower shall not engage and shall not permit any other Loan Party to engage in any nonexempt prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code, as such sections relate to Borrower and Owner, or in any transaction that would cause any obligation or action taken or to be taken hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement, or any other Loan Document) to be a non-exempt prohibited transaction under ERISA.

5.26   **Plan Assets.** Borrower will do, or cause to be done, all things necessary to ensure that neither it nor Owner will be deemed to hold Plan Assets at any time.

5.27   **Lender's Attorneys' Fees and Expenses.** If at any time hereafter prior to repayment of the Loan in full (i) upon a default or upon Lender's reasonable anticipation of a default, Lender employs counsel for advice or other representation (whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted and, if such suit is filed or legal proceedings instituted, through all administrative, trial, and appellate levels) with respect to the Loan, the Property, the Collateral or any part thereof, this Agreement or any of the other Loan Documents, including any proposed or actual restructuring of the Loan, or to protect, collect, sell, take possession of, or liquidate the Collateral or any part thereof, or to attempt to enforce any security interest or lien on any part of the Collateral, or to evaluate, analyze or enforce any rights of Lender or any of Borrower's obligations hereunder or those of any other Person which may be obligated to Lender by virtue of this Agreement or any other Loan Document, or (ii) Lender employs counsel to analyze and respond to any request for consent or approval made by any Loan Party, then, in any such event, all of the reasonable attorneys' fees and expenses arising from such services, and all reasonable expenses, costs and charges relating thereto, shall be paid by Borrower on demand and if Borrower fails to pay such fees, costs and expenses payment thereof by Lender shall be deemed to constitute disbursement of the proceeds of the Loan hereunder (even if the total amount of disbursements would exceed the face amount of the Note) and shall constitute additional indebtedness of Borrower to Lender, payable on demand and secured by the Pledge Agreement and the other Loan Documents.

5.28   **Loan Expenses.** Borrower agrees to pay all Costs incurred by Lender within ten (10) days after demand. All Costs shall be Borrower's obligation regardless of whether the Loan is disbursed in whole or in part unless such failure to disburse is due to Lender's wrongful failure