Exhibit C

# LOAN AGREEMENT

between

**The Prudential Insurance Company of America, a New Jersey corporation**

**("Lender")**

and

**Navy Yard Four Associates Limited Partnership**
**a Delaware limited partnership**
**("Borrower")**

**$18,466,000 Loan**

**Boston, Massachusetts**

# Table of Contents

Page

ARTICLE 1 - DEFINED TERMS ................................................................................................................. 1

1.1    DEFINITIONS ............................................................................................................................. 1
1.2    USE OF DEFINED TERMS ......................................................................................................... 14

ARTICLE 2 - THE LOAN ........................................................................................................................ 14

2.1    AGREEMENT TO BORROW AND LEND ..................................................................................... 14
2.2    DISBURSEMENTS .................................................................................................................... 15
2.3    LENDER'S EXIT FEE ............................................................................................................... 15
2.4    LOAN TERM ........................................................................................................................... 15
2.5    BASE INTEREST ACCRUAL ..................................................................................................... 15
2.6    PAYMENTS ............................................................................................................................. 15
2.7    INTEREST RATE CAP AGREEMENT ......................................................................................... 17
2.8    PREPAYMENTS OF LOAN ....................................................................................................... 17
2.9    COLLATERAL .......................................................................................................................... 17
2.10   SALE OF UNITS ...................................................................................................................... 17

ARTICLE 3 - CONDITIONS PRECEDENT ............................................................................................. 18

3.1    INITIAL DISBURSEMENT ........................................................................................................ 18
3.2    SUBSEQUENT DISBURSEMENTS ............................................................................................. 21

ARTICLE 4 - REPRESENTATIONS AND WARRANTIES ......................................................................... 22

4.1    ENTITY EXISTENCE ................................................................................................................ 22
4.2    OWNERSHIP AND CONTROL OF BORROWER ........................................................................... 22
4.3    ORGANIZATIONAL DOCUMENTS; AUTHORITY ....................................................................... 23
4.4    OTHER AGREEMENTS ............................................................................................................. 23
4.5    PROPERTY .............................................................................................................................. 23
4.6    PROPERTY ACCESS ................................................................................................................. 24
4.7    UTILITIES ............................................................................................................................... 24
4.8    FLOOD HAZARDS/WETLANDS ................................................................................................ 24
4.9    TAXES/ASSESSMENTS ............................................................................................................ 24
4.10   EMINENT DOMAIN ................................................................................................................. 24
4.11   LITIGATION ............................................................................................................................ 24
4.12   SENIOR LOAN ........................................................................................................................ 25
4.13   NO ADDITIONAL INDEBTEDNESS ........................................................................................... 25
4.14   ACCURACY ............................................................................................................................ 25
4.15   FOREIGN OWNERSHIP ............................................................................................................ 25
4.16   ERISA ................................................................................................................................... 25
4.17   SOLVENCY ............................................................................................................................. 26
4.18   FINANCIAL CONDITION; NO CHANGE ................................................................................... 26
4.19   SINGLE ASSET ENTITY .......................................................................................................... 26
4.20   NO BROKER ........................................................................................................................... 27
4.21   LEASES .................................................................................................................................. 27
4.22   NO EVENT OF DEFAULT ........................................................................................................ 27
4.23   RICO .................................................................................................................................... 27
4.24   NO SET-OFF .......................................................................................................................... 27
4.25   PRIORITY OF LIENS ............................................................................................................... 27
4.26   ENVIRONMENTAL REPORTS ................................................................................................... 27
4.27   CONSTRUCTION DOCUMENTS ................................................................................................ 28
4.28   CONSTRUCTION BUDGET AND SOURCES AND USES ............................................................... 28
4.29   LABOR RELATIONS ................................................................................................................ 28

4.30    INTELLECTUAL PROPERTY ........................................................................................ 28
4.31    OFAC COMPLIANCE ............................................................................................... 28
4.32    CONSTITUENT DOCUMENTS ..................................................................................... 29
4.33    ADDITIONAL AGREEMENTS ....................................................................................... 29

ARTICLE 5 - BORROWER'S COVENANTS ......................................................................... 29

5.1     PAYMENT OF INDEBTEDNESS; PERFORMANCE OF OBLIGATIONS ..................................... 29
5.2     TAXES AND OTHER OBLIGATIONS ............................................................................. 29
5.3     INSURANCE ........................................................................................................... 29
5.4     ESCROWS. .............................................................................................................. 30
5.5     CONDEMNATION ..................................................................................................... 31
5.6     PRESERVATION AND MAINTENANCE OF THE PROPERTY .................................................. 31
5.7     LIENABLE WORK ..................................................................................................... 31
5.8     PERSONAL PROPERTY ............................................................................................. 31
5.9     LEASES .................................................................................................................. 31
5.10    PROPERTY MANAGER ............................................................................................. 32
5.11    INSPECTION ........................................................................................................... 32
5.12    BOOKS AND RECORDS/AUDITS ............................................................................... 33
5.13    FINANCIAL STATEMENTS; BALANCE SHEETS ............................................................... 33
5.14    ADDITIONAL REPORTING REQUIREMENTS ................................................................... 34
5.15    USE OF LOAN AND SENIOR LOAN PROCEEDS; DISTRIBUTION AND USE OF CASH FLOW ...... 35
5.16    NOTICE OF LITIGATION, DEFAULT OR EQUITY CONTRIBUTION ...................................... 36
5.17    AFFILIATE TRANSACTIONS ....................................................................................... 36
5.18    NO COMMINGLING OF FUNDS .................................................................................. 36
5.19    EXISTENCE; COMPLIANCE WITH LEGAL REQUIREMENTS ............................................... 36
5.20    CHANGE IN BUSINESS ............................................................................................ 36
5.21    NO AMENDMENTS OF ORGANIZATIONAL DOCUMENTS ................................................... 37
5.22    TRANSFERS OF THE PROPERTY OR BENEFICIAL INTERESTS IN BORROWER ...................... 37
5.23    NO ADDITIONAL LIENS OR ENCUMBRANCES ............................................................... 37
5.24    NO ADDITIONAL INDEBTEDNESS ............................................................................... 38
5.25    NONEXEMPT ERISA TRANSACTIONS ........................................................................ 38
5.26    PLAN ASSETS ......................................................................................................... 38
5.27    LENDER'S ATTORNEYS' FEES AND EXPENSES ............................................................ 38
5.28    LOAN EXPENSES ..................................................................................................... 38
5.29    INDEMNITY ............................................................................................................. 39
5.30    DOCUMENTS OF FURTHER ASSURANCE. ..................................................................... 39
5.31    SURVIVAL OF REPRESENTATIONS AND WARRANTIES ..................................................... 39
5.32    CONSTRUCTION DOCUMENTS; CHANGE ORDERS ........................................................ 40
5.33    TRANSFER AND OTHER TAXES .................................................................................. 40
5.34    CONSTRUCTION REPORTING ..................................................................................... 40
5.35    CONSTRUCTION OF PROPERTY. ................................................................................. 41
5.36    CONTRACTS FOR SALE OF UNITS ............................................................................. 41
5.37    CONDOMINIUM COVENANTS ..................................................................................... 42
5.38    SALE OF RETAIL SPACE. .......................................................................................... 43
5.39    LENDER'S CONSULTANT ........................................................................................... 43
5.40    PATRIOT ACT ......................................................................................................... 43
5.41    TRANSFERS OF SENIOR LOAN .................................................................................. 44
5.42    UNIT SALES ........................................................................................................... 44
5.43    COMPLIANCE WITH ADA .......................................................................................... 44
5.44    ADA CLAIMS .......................................................................................................... 45
5.45    TAX PARCEL ........................................................................................................... 45
5.46    ASSIGNMENT OF ACCOUNTS ..................................................................................... 45

ARTICLE 6 - SENIOR LOAN .............................................................................................. 45

6.1     COMPLIANCE WITH SENIOR LOAN DOCUMENTS; LENDER CURE .................................... 45
6.2     ESTOPPELS ............................................................................................................. 46

| | | |
|---|---|---|
| 6.3 | ACQUISITION OF THE SENIOR LOAN | 47 |
| 6.4 | DEED-IN-LIEU | 47 |
| 6.5 | SENIOR LOAN IN BALANCE | 47 |
| 6.6 | COPIES OF SENIOR LOAN REQUESTS | 48 |
| 6.7 | LENDER'S RIGHT NOT CONDITIONED UPON EVENT OF DEFAULT | 48 |

**ARTICLE 7 - CASUALTY AND CONDEMNATION** ..... **48**

| | | |
|---|---|---|
| 7.1 | LENDER'S ELECTION TO APPLY INSURANCE AND CONDEMNATION PROCEEDS TO INDEBTEDNESS | 48 |
| 7.2 | BORROWER'S OBLIGATION TO REBUILD AND USE OF PROCEEDS THEREFOR | 49 |

**ARTICLE 8 - EVENTS OF DEFAULT; REMEDIES** ..... **50**

| | | |
|---|---|---|
| 8.1 | EVENTS OF DEFAULT | 50 |
| 8.2 | ACCELERATION; REMEDIES | 52 |
| 8.3 | NON-WAIVER OF REMEDIES | 53 |

**ARTICLE 9 - RECOURSE OBLIGATIONS** ..... **53**

| | | |
|---|---|---|
| 9.1 | EXCULPATION | 53 |

**ARTICLE 10 - MISCELLANEOUS** ..... **53**

| | | |
|---|---|---|
| 10.1 | BORROWER AND LIEN NOT RELEASED | 53 |
| 10.2 | DISCLOSURE OF INFORMATION | 53 |
| 10.3 | SALE OF LOAN | 53 |
| 10.4 | FORBEARANCE BY LENDER NOT A WAIVER | 54 |
| 10.5 | WAIVER OF STATUTE OF LIMITATIONS | 54 |
| 10.6 | GOVERNING LAW; SEVERABILITY | 54 |
| 10.7 | RELATIONSHIP | 54 |
| 10.8 | DISCLAIMERS BY LENDER | 54 |
| 10.9 | RIGHT OF LENDER TO MAKE ADVANCES TO CURE BORROWER'S DEFAULTS | 55 |
| 10.10 | NOTICES | 55 |
| 10.11 | SUCCESSORS AND ASSIGNS BOUND; AGENTS; AND CAPTIONS AND RECITALS | 57 |
| 10.12 | LOSS OF NOTE | 58 |
| 10.13 | WAIVER OF CONSEQUENTIAL DAMAGES | 58 |
| 10.14 | SOLE DISCRETION OF LENDER | 58 |
| 10.15 | REASONABLENESS | 58 |
| 10.16 | TIME OF ESSENCE | 58 |
| 10.17 | VENUE | 59 |
| 10.18 | JURY TRIAL WAIVER | 59 |
| 10.19 | PROJECT SIGN | 59 |
| 10.20 | COUNTERPARTS | 59 |
| 10.21 | FINAL AGREEMENT/MODIFICATION | 59 |
| 10.22 | FACSIMILE SIGNATURES | 60 |

073449.159058 DGM LIBD/1687331.11

## EXHIBITS

Exhibit A - Legal Description
Exhibit B - Construction Budget
Exhibit C - Schedule of Minimum Sales Prices
Exhibit D - Litigation
Exhibit E – List of Plans
Exhibit F – Form of Mezzanine Loan Endorsement
Exhibit G - Form of Comprehensive Endorsement (improved land) and Form of Zoning 3.1
        (improved land)
Exhibit H - Form of Assignment of Accounts

## SCHEDULES

Schedule 4.5 – Encumbrances
Schedule 4.26 – Environmental Reports
Schedule 5.17 – Affiliate Transactions

# LOAN AGREEMENT

This **LOAN AGREEMENT** (collectively, with any amendments hereto, substitutions herefor, and modifications, renewals, and extensions hereof, this **"Agreement"**) is executed as of October 18, 2005 between NAVY YARD FOUR ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership (**"Borrower"**), and THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation (together with its successors and assigns, **"Lender"**).

## R E C I T A L S:

A.     At the request of Borrower, Lender has agreed to make a loan (the **"Loan"**) to Borrower in the maximum principal amount of Eighteen Million Four Hundred and Sixty-Six Thousand Dollars ($18,466,000) (the **"Loan Amount"**) pursuant to and in accordance with the terms and conditions contained herein. The Loan is evidenced by that certain promissory note of even date herewith in the original principal amount of the Loan Amount (collectively with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof, the **"Note"**). The terms and provisions of the Note are hereby incorporated herein by reference in this Agreement.

B.     Borrower is the sole member in Navy Yard Four Associates LLC (**"Owner"**) and the owner of one hundred percent (100%) of the legal and beneficial interests in Owner. Owner owns certain real property described on <u>Exhibit A</u> attached hereto consisting of approximately 2.632 acres located on First Street in Boston, Massachusetts (the **"Land"**).

C.     Borrower shall construct on the Land two hundred and twenty four (224) luxury residential condominium units, approximately twenty-seven thousand (27,000) square feet of retail space and two (2) levels of underground parking containing not less than 347 parking spaces (collectively, the "**Project**") using the proceeds of the Loan, the Senior Loan (as hereinafter defined) and Borrower's Equity (as hereinafter defined).

D.     The obligations of Borrower shall be secured by, among other things, a pledge of one hundred percent (100%) of the legal and beneficial interests of Borrower in Owner.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE 1 - DEFINED TERMS

1.1     **Definitions.** The following terms as used herein shall have the following meanings:

"**Acceptable Counterparty**" shall mean any counterparty to the Interest Rate Cap Agreement (i) whose senior unsecured indebtedness is rated at least "A-" by

Standard & Poor's or "A3" by Moody's Investors Service, (ii) whose obligations under the Interest Rate Cap Agreement are guaranteed by an entity whose senior unsecured indebtedness is rated at least "A-" by Standard & Poor's or "A3" by Moody's Investors Service or (iii) that is otherwise acceptable to Lender in its reasonable business judgment.

"**ADA**" shall mean the Americans with Disabilities Act of 1990, as amended and supplemented from time to time.

"**ADA Claims**" shall mean, collectively, (a) any notices received by Borrower, Owner or any Guarantor or any Affiliate of Borrower, Owner or any Guarantor (whether such notices are from any federal, state or local governmental agency or regional office thereof) of the violation or potential violation of ADA occurring on, under or about the Property; and (b) all claims made or threatened by any third party against Borrower, Owner or any Guarantor, any Affiliate of Borrower, Owner or any Guarantor, or otherwise with respect to the Property relating to damage, contribution, cost recovery, compensation, loss or injury resulting from a violation of ADA.

"**Affiliate**" shall mean with respect to any Person (a) any officer, director, general partner, shareholder, member, manager or trustee of such Person, and (b) any other Person directly or indirectly controlling, controlled by, or under common control with such Person. For the purpose of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means having, directly or indirectly, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary, Borrower hereby acknowledges that each Guarantor shall be deemed an Affiliate of Borrower under this Agreement.

"**Affordable Units**" shall mean one of the twenty-two (22) Units identified as an Affordable Housing Unit in Exhibit C.

"**Agreement**" shall have the meaning ascribed to such term in the Introductory Paragraph of this Agreement.

"**Assignment of Accounts**" shall mean that certain Assignment of Accounts in the form attached hereto as Exhibit H to be executed by Owner for the benefit of Lender within five (5) business days of the date upon which the Senior Loan has been repaid, as it may be amended, modified or supplemented.

"**Assignment of Intangibles**" shall mean that certain Assignment of Contracts, Licenses and Permits dated as of the date hereof, from Borrower to Owner, as it may be amended, modified or supplemented.

"**Association**" shall have the meaning ascribed to such term in Section 5.37(a) of this Agreement.

2

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy" as amended from time to time, and any successor statutes thereto.

"**Base Interest**" shall mean the interest that accrues from time to time on the outstanding principal balance of the Loan at the Base Interest Rate.

"**Base Interest Rate**" shall mean a rate *per annum* equal to sixteen percent (16%), compounded monthly.

"**Base Interest Default Rate**" shall mean a rate *per annum* equal to the Base Interest Rate plus four percent (4%).

"**Borrower**" shall have the meaning ascribed to such term in the Introductory Paragraph of this Agreement.

"**Borrower's Equity**" shall have the meaning ascribed to such term in Section 3.14 of this Agreement.

"**Borrower's Organizational Documents**" shall mean, collectively, that certain Amended and Restated Limited Partnership Agreement of Borrower, dated as of October 17, 2005 and that certain Certificate of Limited Partnership of Borrower filed in the office of the Secretary of State of Delaware on July 12, 2004, as amended by that certain Amendment to Certificate of Limited Partnership, dated as of October 13, 2005.

"**BRA**" shall mean the Boston Redevelopment Authority.

"**Budget Line Items**" shall mean the line items included in the Construction Budget, including, the cost of all labor, materials, equipment, fixtures and furnishings needed for the Completion of the Improvements, and all other costs, fees and expenses relating in any way whatsoever to the Completion of the Improvements and the operation of the Project.

"**business day**" shall mean any day, other than a Saturday or a Sunday, when banks in New Jersey, New York and Massachusetts are not required or authorized to be closed.

"**Carve-Out Guaranty**" shall mean that certain Recourse Carve-Out Guaranty of even date, executed by Guarantors for the benefit of Lender, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

"**Charges**" shall mean any and all taxes, assessments, fines, impositions and other charges and obligations, which may become a lien on or charge against the Property.

"**Closing Certificate**" shall mean that certain Closing Certificate dated as of the date hereof executed by Borrower for the benefit of Lender.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall mean, collectively, any and all property now or hereafter assigned, pledged, transferred or encumbered by the Loan Documents, together with any and all other property from time to time securing payment or performance by any Loan Party of any of their respective obligations under any of the Loan Documents to which they are a party.

"**Completion**" shall mean the point at which all of the following requirements are satisfied: (a) all of the Improvements have been completed substantially in accordance with the Construction Documents, applicable Laws, and all covenants and restrictions of record relating to the Property or any portion thereof, in a good and workmanlike manner on or before the Required Completion Date, subject only to (i) Punchlist Items having a cost to complete determined by the Lender's Consultant of not more than $150,000, (ii) tenant improvements for unleased retail space or partially completed retail space and (iii) work for purchasers selections for Unit options, extras or upgrades; (b) all portions of the buildings are ready for occupancy, including installation of all equipment, appliances, carpeting, and other interior finishes as shown in the Construction Documents, subject to tenant improvement work for the retail portion of the Property and completion of work for purchasers selections for Unit options, extras or upgrades; (c) either (i) a final permanent certificate of occupancy, which shall be in full force and effect, for the Property and all of the Improvements has been issued and delivered to Borrower and Lender has received a true copy of the same or (ii) a temporary certificate of occupancy, which shall be in full force and effect, for the Property and all of the Improvements has been issued to Owner and delivered to Borrower and Lender has received a true copy of the same (the date on which such temporary certificate of occupancy is first issued, the "**Initial TCO Date**") which, in the case of clause (i) or (ii), permits the Property and the Improvements to be used for their respective intended purposes (subject to completion of tenant improvement work for the retail portion of the Property and completion of work for purchasers' selections for Unit options, extras or upgrades); and (d) all other Permits have been issued and delivered to Borrower, Lender has received a true copy of the same and there is no pending or threatened proceeding or action to revoke, attack, invalidate, rescind or modify any Permit or asserting that any such Permit does not permit the occupancy, maintenance, use or occupancy of the Property as contemplated in the Construction Documents; (e) all contractors, subcontractors, suppliers, architects and engineers who performed work for the Property shall have been paid in full (or adequate reserves shall have been set aside for the payment thereof in a manner reasonably satisfactory to Lender in the event of any disputed amounts), and all liens arising from the construction of the Property shall have been satisfied or bonded over and reasonably satisfactory evidence of the same shall have been provided to Lender; (f) final as-built drawings and surveys shall have been provided to Lender; (g) Lender has received the following endorsements to the Title Insurance Policy: (i) a zoning 3.1 endorsement for improved land, and (ii) a comprehensive endorsement for improved land, each in the form provided in Exhibit G hereto; and (h) Lender's Consultant and the Project Architect

4

have executed certificates confirming that the requirements set forth in clauses (a) through (f) hereinabove have been satisfied in all reasonable respects. The word "Complete" (or forms thereof) shall have a correlative meanings.

"**Completion Guaranty**" shall mean a joint and several guaranty with respect to completion of the construction of the Improvements, as more particularly provided therein, executed by Guarantors for the benefit of Lender, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

"**Condemnation**" shall mean any taking for public or quasi-public purposes (including a conveyance in *lieu* thereof). The word "condemn" (or forms thereof) shall have a correlative meanings.

"**Constituent Documents**" shall have the meaning ascribed to such term in Section 4.32 of this Agreement.

"**Construction Budget**" shall mean that certain budget for the construction of the Improvements, including all hard and soft costs (including debt service due on the Senior Loan prior to the Required Completion Date), and projected operating deficits expected to be incurred prior to the Required Completion Date, as initially approved by Lender and Senior Lender, a copy of which is attached hereto and made a part hereof as Exhibit B, and which may be amended or modified from time to time only by Permitted Change Orders.

"**Construction Contract**" shall mean the Construction Management Agreement dated as of June 21, 2005 between Borrower and Turner Construction Company for construction of the Improvements, as amended by that certain Amendment No. 1 to Agreement between Owned and Construction Manager, dated as of August 20, 2005, as further amended or modified from time to time only by Permitted Change Orders.

"**Construction Documents**" shall mean, collectively, the Plans, the Construction Budget, the Construction Contract, all Major Contracts relating to the construction of the Property, all subcontracts relating to the construction of the Property in excess of $1,000,000, the contract with the Project Architect, and the subguard policy covering all subcontractors performing any services or delivering any materials in connection with the Project, all as initially approved by Lender and as amended or modified from time to time only by Permitted Change Orders or with Lender's prior written approval, and the Land Disposition Agreement, the Cooperation Agreement and the Transportation Agreement.

"**Contingency Fund**" shall mean the line items contained in the Construction Budget designated for contingency for Hard Costs and Soft Costs which represent amounts necessary to provide reasonable assurances to Lender that funds are available within the Construction Budget if additional costs, expenses and/or delays are incurred or additional interest accrues on the Loan, or other unanticipated events or problems occur.

"**Cooperation Agreement**" means that certain Cooperation Agreement dated as of March 21, 2005 by and between the BRA and Borrower, as assigned to Owner.

5

"**Cost Basis**" means the amount per Unit equal to (a) the sum of (i) $94,098,000, (ii) the Loan Amount, (iii) the amount of accrued interest on the Loan as of the date of such calculation, and (iv) $900,000 multiplied by (b) the ratio of the Minimum Sales Price for such Unit set forth on the Schedule of Minimum Sales Prices as a function of the Minimum Sales Price for all Units set forth on the Schedule of Minimum Sales Prices.

"**Costs**" shall mean all expenditures and expenses which may be paid or incurred by or on behalf of Lender in connection with (i) the documentation, modification, workout, collection or enforcement of the Loan or any of the Loan Documents, and (ii) the exercise of any rights or remedies granted to Lender under any of the Loan Documents, including costs, fees and expenses incurred in determining whether conditions precedent to the obligations of Lender under this Agreement have been satisfied and in connection with the Title Insurance Policy and Lender's Title Insurance Policy, the exercise by Lender of its rights, including the remedies under Articles 6 (Senior Loan) and 8 (Events of Default; Remedies) of this Agreement, repair costs, payments to remove or protect against liens, amounts due under Section 5.27 (Lender's Attorneys' Fees and Expenses) of this Agreement and any other attorneys' fees (including fees of Lender's inside counsel), receivers' fees, appraisers' fees, engineers' fees, accountants' fees, independent consultants' fees (including construction and environmental consultants), and all other costs and expenses incurred in connection with any of the foregoing to the extent Lender is authorized to pay such other costs and expenses under the terms of this Agreement, Lender's out-of-pocket costs and expenses related to any audit or inspection of the Property, all costs and expenses incurred by Lender in connection with the determination of whether any Loan Party has performed the obligations undertaken by such Loan Party under the Loan Documents, outlays for documentary and expert evidence, stenographers' charges, stamp taxes, transfer taxes, publication costs, and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title searches and examination, title insurance policies, and similar data and assurances with respect to Borrower's title to the Collateral and title to the Property as Lender may deem reasonably necessary in connection with any sale of any portion of the Collateral.

"**Declaration**" shall mean the Declaration of Condominium pursuant to which the Property will be converted to a condominium regime of ownership in accordance with the Massachusetts Condominium Act.

"**Delaware Act**" shall mean the Delaware Limited Partnership Act, as amended from time to time.

"**Encumbrances**" shall have the meaning ascribed to such term in Section 4.5 of this Agreement.

"**Environmental Indemnity**" shall mean an Environmental Indemnity Agreement, executed by Borrower and Guarantors for the benefit of Lender, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

6

**"Environmental Policy"** shall have the meaning ascribed to such term in <u>Section 3.1.9</u> of this Agreement.

**"Environmental Reports"** shall have the meaning ascribed to such term in <u>Section 4.26</u> of this Agreement.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

**"Estimated Collateral Value Statements"** shall mean, collectively, the Estimated Collateral Value Statement of each Guarantor dated as of June 30, 2004 provided to Lender and all updates thereto delivered on or before November 30th of each subsequent year during the term of the Loan.

**"Event of Default"** shall have the meaning ascribed to such term in <u>Section 8.1</u> of this Agreement.

**"Exit Fee"** shall have the meaning ascribed to such term in <u>Section 2.3</u> of this Agreement.

**"Extension Conditions"** shall have the meaning ascribed to such term in <u>Section 2.4</u> of this Agreement.

**"Extension Fee"** shall mean an amount equal to 0.3% of the outstanding principal balance of the Loan on the Maturity Date.

**"Force Majeure Events"** shall mean, to the extent beyond the reasonable control of Borrower or Owner and the cause of a delay in Completion, strikes, acts of God, fire, earthquake, floods, explosion, actions of the elements, other accidents or casualty, declared or undeclared war, riots, mob violence, acts of terrorism, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, lockouts, actions of labor unions, condemnation, court orders, laws, rules, regulations or orders of governmental authorities or other cause beyond the reasonable control of Owner or Borrower; <u>provided</u> that, in each of the foregoing cases, (a) Borrower gives notice of any such delay to Lender within ten (10) days after the initial occurrence of the event resulting in such delay, and, after the initial notification, promptly after request of Lender notifies Lender and Lender's Construction Consultant of the status of the applicable. delay, and (b) Borrower uses all commercially reasonable efforts to mitigate the delay caused by such Force Majeure Event; <u>provided, however</u>, in no event shall a Force Majeure Event include lack of or inability to procure moneys to fulfill Borrower's obligations under this Agreement.

**"General Partner"** shall mean TCR Navy Yard Four Limited Partnership, a Delaware limited partnership and general partner of Borrower, together with General Partner's successors and assigns.

7

"**General Partner's General Partner**" shall mean TCR Northeast Condominiums, Inc., a Texas corporation and general partner of General Partner, together with General Partner's General Partner's successors and assigns.

"**Guarantors**" shall mean, collectively,  J. Ronald Terwilliger, William C. MacDonald, Joseph S. Torg, CFP Residential Ltd., a Texas limited partnership, and TCF Residential Partnership, Ltd., a Texas limited partnership.

"**Hard Costs**" shall mean the aggregate costs of all labor, materials, equipment and fixtures necessary for completion of construction of the Improvements, as more particularly set forth in the Construction Budget.

"**Immediate Family Member**" shall mean, as to any specified individual, such individual's spouse, siblings, parents, grandparents, children or grandchildren (by birth, adoption or marriage, as applicable), any spouse of any such sibling, parent, grandparent, child or grandchild, any trust created for the benefit of such individual and/or any of the foregoing or any other entity wholly owned and controlled by such individual and/or any of the foregoing.

"**Improvements**" shall mean the improvements described in Recital C and all other improvements reasonably necessary for the use and occupancy of the Property as intended by the Construction Documents, including any off-site sitework or improvements.

"**Income Tax**" means any federal, state or local income or franchise taxes actually payable by Borrower or persons holding direct or indirect ownership interests in Borrower assuming that the net income of Borrower from the sale of one or more Units is fully subject to tax at the rate of 40%.

"**Income Tax Allowance**" means, with respect to each Unit, an amount equal to the product of (a) (i) the Net Sales Proceeds of such Unit (before reduction for Income Tax Allowance) minus (ii) the Cost Basis of such Unit, multiplied by (b) forty percent (40%).

"**Income Tax Allowance Account**" shall have the meaning ascribed to such term in Section 2.6.1 of this Agreement.

"**Indebtedness**" shall mean all payment obligations of Borrower to Lender (including the obligation to pay all interest due in connection therewith and the Exit Fee).

"**Initial Disbursement**" shall have the meaning ascribed to such term in Section 2.2 of this Agreement.

"**Initial TCO Date**" shall have the meaning ascribed to such term in the definition of the term "Completion".

"**Intercreditor Agreement**" shall mean an agreement between Lender and Senior Lender, which sets forth the terms and conditions of the relationship of Lender and

Senior Lender in respect of the Loan and the Senior Loan, in form and substance reasonably satisfactory to Lender, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

"**Interest Rate Cap Agreement**" shall mean an Interest Rate Cap Agreement (together with the confirmation and schedules relating thereto) in form and substance satisfactory to Lender between Owner and an Acceptable Counterparty and satisfying the requirements of the Senior Loan Documents.

"**Intellectual Property**" shall have the meaning ascribed to such term in <u>Section 4.30</u> of this Agreement.

"**knowledge**", when used with respect to Borrower to modify a representation or warranty, shall mean actual knowledge of Joseph S. Torg, David Lamason or Sheryl A. Brown.

"**Land**" shall have the meaning ascribed to such term in <u>Recital B</u> of this Agreement.

"**Land Disposition Agreement**" shall mean that certain Land Disposition Agreement, dated as of November 12, 2004, by and between BRA and Borrower, as amended by that certain First Amendment to Land Disposition Agreement dated as of March 21, 2005 between BRA and Borrower, as assigned by Borrower to Owner pursuant to the Assignment of Intangibles, and as further amended by the certain Second Amendment to Land Disposition Agreement dated as of October 13, 2005 by and among BRA and Owner.

"**Laws**" shall mean, collectively, the Permits and all federal, state and local laws, statutes, codes, ordinances, orders, decrees, rules, and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

"**Leases**" shall mean collectively all leases or other arrangements for occupancy of space for any portion of the Property, as initially approved by Lender and as amended or modified from time to time with the approval of Lender or as otherwise expressly permitted by the terms of this Agreement.

"**Lender**" shall have the meaning ascribed to such term in the Introductory Paragraph of this Agreement.

"**Lender's Consultant**" shall have the meaning ascribed to such term in <u>Section 5.39</u> of this Agreement.

"**Lender Termination Request**" shall have the meaning ascribed to such term in <u>Section 5.10</u> of this Agreement.

"**Lender's Title Insurance Policy**" shall mean the lender's UCC-9 title insurance policy issued to Lender.

9

"**Limited Partner**" means LDA Parcel 4, LLC, a Massachusetts limited liability company and the sole limited partner in Borrower.

"**Loan**" shall have the meaning ascribed to such term in the Recitals of this Agreement.

"**Loan Amount**" shall have the meaning ascribed to such term in the Recitals of this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Pledge Agreement, the Completion Guaranty, the Carve-Out Guaranty, the Environmental Indemnity, the Closing Certificate, the Assignment of Accounts, and any other documents evidencing or securing the Loan, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

"**Loan Opening Date**" shall mean the date upon which the Initial Disbursement of the Loan is disbursed by Lender.

"**Loan Parties**" shall mean, collectively, Borrower and Guarantors.

"**Loan Year**" shall mean the period from the Loan Opening Date through the last day of the same month in the following year and thereafter each successive twelve (12) month period.

"**Lockout Date**" shall have the meaning ascribed to such term in the definition of Prepayment Premium.

"**Lockout Period**" shall mean the period until the twenty fourth (24th) month anniversary of the Loan Opening Date.

"**Losses**" shall mean and include any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages, foreseeable and unforeseeable, of whatever kind or nature (including reasonable attorneys' fees and other costs of defense).

"**Manager Termination Notice**" shall have the meaning ascribed to such term in Section 5.10 of this Agreement.

"**Major Contracts**" shall mean, collectively, (a) all contracts relating to the construction of the Property that are entered into by or on behalf of Borrower or Owner that are: (i) with the Project Architect, (ii) with any consulting or supervising engineers, and (iii) with any other contractors providing labor, materials or services to the Property, other than contracts under which the payments required to be made by Borrower or Owner do not exceed $500,000; and (b) all contracts relating to the ownership, management, leasing, operation, and administration of the Property that are entered into by or on behalf of Borrower or Owner, other than contracts under which the payments required to be made by Borrower or Owner do not exceed $150,000.

"**Market Units**" shall mean all of the Units other than the Affordable Units.

"**Maturity Date**" shall mean October 18, 2008, as such date may be extended in accordance with the terms of the Note, or as such date may be accelerated in accordance with the terms of the Loan Documents.

"**Minimum Sales Price**" shall mean (i) in the case of a residential Unit, the minimum sales price shown on Exhibit C attached hereto, and (ii) in the case of a parking space $45,000 per parking space.

"**Net Operating Income**" shall mean all revenue from the Property (other than Unit sale proceeds and proceeds from the sale of retail condominium Units, parking spaces and storage space), including all rental income, less reasonable and customary operating expenses for a property similar to the Property in Boston, Massachusetts reasonably approved by Lender which shall not include any developer fee payable to any Affiliate of any Loan Party.

"**Net Sales Proceeds**" shall have the meaning ascribed to such term in Section 2.10 of this Agreement.

"**Note**" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"**OFAC Lists**" shall have the meaning ascribed to such term in Section 4.31 of this Agreement.

"**Owner**" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"**Permits**" shall mean, collectively, all permits, licenses, license agreements, consents, approvals, variances, conditional or special use permits, and other authorizations and entitlements in any way relating to the development, construction, use, occupancy, operation, maintenance, enjoyment, acquisition or ownership of the Property or any portion thereof.

"**Permitted Change Order**" shall mean any change order to the Construction Budget or any of the other Construction Documents if and so long as (a) Senior Lender has approved such change order or approval of such change order by Senior Lender is not required under the terms of the Senior Loan Documents, (b) such change order does not involve an amount in excess of $100,000, (c) the aggregate amount of such change order and all other change orders (excluding change orders approved by Lender) to the Construction Budget or any of the other Construction Documents does not increase or decrease the total cost set forth in the Construction Budget by more than five percent (5%) of the total cost set forth in the Construction Budget (unless Borrower pays all amounts in excess of such five percent (5%) out of its own funds and not from the Senior Loan), and (d) such change order will not have an adverse effect on the structure, foundation or systems of the Project.

11

"**Permitted Transfer**" shall have the meaning ascribed to such term in Section 5.22 of this Agreement.

"**Person**" shall mean any individual, trust, estate, partnership, limited liability company, corporation, bank, governmental agency, any other incorporated or unincorporated organization, or any other entity recognized as legally distinct for any purpose, whether acting in an individual, fiduciary or other capacity.

"**Personal Property**" shall mean, collectively, any personal property owned by Borrower or Owner now or at any time located at or used in connection with the construction, ownership, management, leasing, operation, and administration of the Property.

"**Plan Assets**" shall mean assets of any employee benefit plan subject to Part 4, Subtitle B, Title I of ERISA, within the meaning of 29 C.F.R. Section 2510.3-101.

"**Plans**" shall mean, the plans and specifications for construction of the Improvements listed on Exhibit E attached hereto, as amended from time to time by Permitted Change Orders or with the prior written approval of Lender.

"**Pledge Agreement**" shall mean a pledge agreement executed by Borrower, of all of its legal and beneficial interests in Owner, together with any amendments thereto, substitutions therefor, and modifications, renewals, and extensions thereof.

"**Prepayment Premium**" shall mean, if the entire principal balance of the Loan is paid or declared due and payable during the Lockout Period, the additional amount required to allow Lender to invest such additional amount, together with the outstanding principal balance paid at the time of such repayment, in United States government securities having maturity dates in the closest proximity date to the date on which the Lockout Period expires (the "**Lockout Date**") as may then be available in order to receive the principal balance of the Loan on the Lockout Date and monthly payments of interest on the principal amount of the Loan through the Lockout Date calculated at the Base Interest Rate.

"**Proceeds**" shall have the meaning ascribed to such term in Section 2.6 of this Agreement.

"**Prohibited Person**" shall have the meaning ascribed to such term in Section 5.40 of this Agreement.

"**Project**" shall have the meaning ascribed to such term in the Recitals of this Agreement, as further described in the Construction Documents.

"**Project Architect**" shall mean Elkus/Manfredi Architects, Ltd.

"**Property**" shall mean, collectively, the Land, the Improvements, and all other improvements now or hereafter located on the Land and all rights, privileges, easements, hereditaments and appurtenances, thereunto relating or appertaining, and all Personal

Property; provided that from and after the time the Property becomes subject to a condominium form of ownership, and except as provided herein, "Property" as used in this Agreement shall not include condominium Units that have been sold in accordance with the terms hereof.

"**Punchlist Items**" shall mean unfinished items of construction of the Improvements, which are not necessary for the commencement and continuation of the sale of Units, or the safe use of the Property, and the cost of which, in the aggregate, does not exceed more than $150,000, as reasonably determined by Lender, provided that undisbursed proceeds of the Senior Loan plus any additional amounts placed in escrow to fund completion of the Punchlist Items, must be at least equal to 150% of the estimated cost to complete such items.

"**Qualified Sale Contract**" shall mean a fully executed contract for the sale of a residential Unit between Owner and an unrelated third party not an Affiliate of any Loan Party: (i) which is on the form pre-approved by Lender; (ii) which provides for a base sale price, not including options, extras or upgrades, that when added to the base sale price of all other residential Units previously sold or then subject to a Qualified Sale Contract, is not less than the residential Unit Minimum Sales Prices (as listed in the Exhibit C attached to this Agreement); (iii) which provides for an earnest money deposit with Owner in the form of cash and which earnest money deposit shall be in an amount equal to not less than five percent (5%) of the applicable base sales price for the Unit; (iv) under which the buyer's obligation to close is not subject to any contingencies other than the performance by Owner of its obligations under the contract, customary buyer mortgage financing contingencies and completion of the applicable Unit; (v) which is not assignable by the buyer thereunder; (vi) under which the buyer's right to terminate the contract without cause has expired; (vii) which does not require Owner to close the sale of the Unit on a date earlier than the expected completion date for such Unit based on the approved construction schedule; (viii) under which the contract purchaser is a Person that represents and warrants to Owner that it is neither the same as, nor an Affiliate of, the purchaser under any other contract that provides for the sale of more than 3 Units and, is to Borrower's knowledge, not such a Person; and (ix) which complies with the terms of the Senior Loan Documents.

"**Required Completion Date**" shall mean April 28, 2008; provided, however, that if Completion is delayed due to a Force Majeure Event, the Required Completion Date shall be extended by such period of time as is reasonable based upon the delay caused by the Force Majeure Event as long as such delay does not result in a default under the Senior Loan and, notwithstanding anything to the contrary contained herein, such delay shall in no event extend the Required Completion Date to a date later than July 28, 2008.

"**Sale Price Adjustments**" shall have the meaning ascribed to such term in Section 2.10 of this Agreement.

"**Senior Lender**" shall mean Eurohypo AG, New York Branch.

"**Senior Loan**" shall mean that certain loan made to Owner by Senior Lender pursuant to and in accordance with the terms of the Senior Loan Documents.

"**Senior Loan Documents**" shall mean, collectively, all documents which evidence and secure the Senior Loan, as initially approved by Lender and as amended or modified from time to time only as expressly permitted by the terms of this Agreement.

"**Soft Costs**" shall mean interest payable on the principal amount of the Senior Loan, carrying costs for the Project and all other costs in the Construction Budget which constitute costs to Complete the Project, excluding Hard Costs.

"**Soil Report**" shall have the meaning ascribed to such term in Section 3.1.15 of this Agreement.

"**Title Company**" shall mean Chicago Title Insurance Company, or any other title insurer approved by Lender.

"**Title Insurance Policy**" shall mean the owner's title insurance policy issued to Owner and that complies with the terms of this Agreement.

"**Transfer**" shall mean any sale, assignment, exchange, transfer, gift, encumbrance, pledge, mortgage, hypothecation or other disposition, in whole or in part, whether voluntary or involuntary, by operation of law or otherwise, except (i) a taking through exercise of powers of eminent domain, (ii) losses through fire, theft or other casualty, and (iii) any sale, assignment, exchange, transfer, gift, or other disposition through operation of a devise or intestate succession.

"**Transportation Agreement**" shall mean that certain Transportation Access Plan Agreement dated as of May 25, 2005 by and between Borrower and BRA, as assigned to Owner by the Assignment of Intangibles.

"**Unit**" or "**Units**" shall mean one or more, as the case may be, of the residential condominium units to be constructed within the Improvements in accordance with the Construction Documents.

1.2    **Use of Defined Terms.**  Defined terms may be used in the singular or the plural. When used in the singular preceded by "a", "an", or "any", such term shall be taken to indicate one or more members of the relevant class.  When used in the plural, such term shall be taken to indicate all members of the relevant class.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase ",without limitation,".

## ARTICLE 2 - THE LOAN

2.1    **Agreement to Borrow and Lend.**  Subject to all of the terms, provisions and conditions set forth in this Agreement, Lender agrees to make and Borrower agrees to accept the Loan.  Borrower agrees to pay all of the Indebtedness in accordance with the terms of the Loan Documents.

14

2.2    **Disbursements.** At such time as all conditions precedent set forth in Section 3.1 hereof have been either satisfied or waived in writing by Lender, Lender shall disburse to or for the benefit of Borrower a portion of the proceeds of the Loan in the amount set forth in the draw request delivered to Lender by Borrower as of the date hereof (the "**Initial Disbursement**"). The remaining proceeds of the Loan shall be disbursed to Borrower in no more than five (5) additional monthly disbursements, such disbursements to be made in accordance with and subject to the terms of Section 3.2.

2.3    **Lender's Exit Fee.** In consideration of Lender making the Loan to Borrower, Borrower shall pay to Lender an exit fee (the "**Exit Fee**") in the amount of $184,660 on the date the last principal payment under the Loan is paid for whatever reason (but no later than the Maturity Date).

2.4    **Loan Term.** The Indebtedness, if not sooner paid, shall be paid in full on the sooner to occur of (a) the Maturity Date, and (b) such date, if any, as Borrower or Owner shall refinance all or any portion of the Senior Loan, which refinancing shall not be deemed to include repayment of the Senior Loan out of proceeds pursuant to Section 2.10. The Maturity Date may be extended for a period of up to one (1) year by written notice thereof delivered to Lender not less than ten (10) and not more than one hundred and twenty (120) days prior to the then-scheduled Maturity Date (the "**Extension Option**") if the following conditions (the "**Extension Conditions**") shall be satisfied at the time of delivery of such notice and at the time of commencement of the extension term:

2.4.1    The term of the Senior Loan shall have been extended at least through the extended date that will constitute the Maturity Date;

2.4.2    There shall exist no Event of Default under the Note or any of the other Loan Documents;

2.4.3    Maker shall have (i) unconditionally closed the sale of not less than one hundred and one (101) Market Units and received an amount that is not less than the aggregate of the Minimum Sales Price (as listed in Exhibit C) for all such Market Units and (ii) shall have executed Qualified Sales Contracts that, when taken together with the number of Market Units for which closing of the applicable sale has occurred as described in item (i) of this definition, provide for sale of a total of not less than one hundred and twenty-one (121) of the Market Units (and such Qualified Sales Contracts shall be in full force and effect as of the original Maturity Date); and

2.4.4    At the time of commencement of the extension term, Maker shall have paid to Holder the Extension Fee.

2.5    **Base Interest Accrual.** Base Interest shall accrue and be payable in accordance with the terms of the Note.

2.6    **Payments.** Notwithstanding the amount of Base Interest, Borrower shall not be required to pay Base Interest on a current basis until payment in full of the Senior Loan. After repayment of the Senior Loan, principal and Base Interest on the Loan shall be due and payable to the extent of 100% of the sum (collectively, "**Proceeds**") of the following: (i) Net Sales

15

Proceeds from the sale of Units, (ii) any other net proceeds from the sale or refinancing of any portion of the Property, and (iii) Net Operating Income. Provided no Event of Default exists, Proceeds shall first be applied to payment of fees and charges due to Lender under the Loan Documents, then in repayment of accrued unpaid Base Interest, and then to the principal balance of the Loan. If an Event of Default exists, Proceeds shall be applied in such priority as Lender elects in its sole discretion.

2.6.1    **Income Tax Allowance**. As a condition to the release of a Unit, Borrower shall cause to be delivered to Senior Lender or, if the Senior Loan has been repaid, Lender, for deposit into an account controlled by Lender (the "**Income Tax Allowance Account**"), an amount equal to the Income Tax Allowance for such Unit to the extent such amount has been deducted from Net Sales Proceeds applied against the Senior Loan or, if the Senior Loan has been repaid, the Loan. Amounts deposited into the Income Tax Allowance Account during any calendar year shall be retained in the Income Tax Allowance Account until such time as holders of direct or indirect ownership interests in Borrower are required to pay such amounts as Income Tax in respect of net income of Borrower from sales of Units to the appropriate tax authority, at which time Borrower will be permitted to withdraw all or part of such amount up to the Income Tax (the "Income Tax Distribution"). Borrower may defer withdrawal of amounts for Income Tax, and any amounts designated for such deferral will be available at a later time designated by Borrower and will not be considered excess amounts for purposes of the following sentence. Subject to the rights of the Senior Lender, in the event that the amounts deposited in the Income Tax Allowance Account with respect to any calendar year exceed the amount of the Income Tax payable for such calendar year, such excess shall be applied by Lender (and Borrower hereby directs the Lender to apply such amounts) to the Loan in accordance with Section 2.6. Borrower may apply all or part of the Income Tax Allowance Account to prepayment of the Senior Loan or the Loan at any time, and any such prepayment of the Loan will be without prepayment premium. Further, if on the Maturity Date Borrower lacks funds sufficient to repay the Loan, including all Base Interest, principal and other amounts due under the Loan Documents in full, then Borrower shall deliver to Lender, on the Maturity Date an amount equal in the aggregate to all Income Tax Distributions to the extent of the unpaid, outstanding balance of the Loan. Notwithstanding anything to the contrary set forth in this Section 2.6.1, until such time as the Limited Partner has provided a creditworthy entity, such entity to be acceptable to Lender in its sole and absolute discretion, to guaranty that portion of the Income Tax Distribution which is available in the Income Tax Allowance Account to be distributed to the Limited Partner, and such entity has entered into a guaranty for the benefit of Lender, such guaranty to be in the form of the Carve-Out Guaranty, provided that the only Recourse Event (as such term is defined in the Carve-Out Guaranty) shall be the event set forth in subsection (n) of the definition of Recourse Event in the Carveout Guaranty and the definition of "Guaranteed Obligations" contained therein shall be modified to refer to Losses arising from the Income Tax Distributions to the holders of any direct or indirect ownership interests in the Limited Partner (as opposed to the General Partner) but shall otherwise remain the same, no distributions from the Income Tax Allowance Account shall be made to the holder of any direct or indirect ownership interests in the Limited Partner.

16

2.7 **Interest Rate Cap Agreement.** Borrower shall cause Owner to comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement. Borrower shall cause Owner to comply with all terms of the Senior Loan Documents pertaining to the Interest Rate Cap Agreement or any permitted substitute therefor. Borrower shall cause Owner to take all actions reasonably requested by Lender to enforce Owner's rights under the Interest Rate Cap Agreement in the event of a default by the Acceptable Counterparty and shall not waive, amend or otherwise modify any of its or the Acceptable Counterparty's material rights or obligations thereunder.

2.8 **Prepayments of Loan.** Prepayment of the Loan, in whole or in part, shall be prohibited, except as expressly provided in Section 2.7 or this Section 2.8. After payment in full of the Senior Loan, Borrower shall be permitted to prepay the Loan in full or in part from Net Sales Proceeds, without payment of any prepayment penalty or premium, including the Prepayment Premium. Borrower shall also be permitted otherwise to prepay the Loan in full but not in part, provided that any such prepayment shall be: (a) accompanied by all accrued and unpaid interest, all fees and costs due from Borrower to Lender and all other portions of the Indebtedness, including the Exit Fee; (b) made only upon Lender's receipt of at least ten (10) days' prior written notice of Borrower's election to prepay; and (c) if occurring prior to the Lockout Date, accompanied by the Prepayment Premium. Borrower acknowledges and agrees that any prepayment of the Loan by virtue of the occurrence of a default or Event of Default hereunder shall be deemed a voluntary prepayment for purposes of determining the applicability of the Prepayment Premium. In the event of any prepayment of the Loan prior to the Lockout Date resulting from a default, Event of Default or acceleration, Borrower shall pay to Lender, together with all other amounts owing under the Loan Documents, the Prepayment Premium. Notwithstanding any provision in this Agreement or any of the other Loan Documents to the contrary, Borrower shall not be required to pay any Prepayment Premium if the Indebtedness is prepaid as a result of Lender's election to have insurance or condemnation proceeds applied to the Indebtedness in accordance with the terms of Section 7.1 of this Agreement. Nothing in this Section 2.8 shall limit Borrower's obligation to pay the Exit Fee required by Section 2.3.

2.9 **Collateral.** The Loan and all other Indebtedness and obligations under the Loan Documents are and shall be secured by the Collateral.

2.10 **Sale of Units.** Prior to the repayment in full of the Senior Loan, all Net Sales Proceeds (as hereinafter defined) shall be paid to Senior Lender in repayment of the Senior Loan. "**Net Sales Proceeds**" shall mean, for each Unit (including retail Units), parking space or storage space, the amount equal to the difference between:

(i)     the gross sale price of such Unit, parking space or storage space, including any amount attributable to options, extras or upgrades to the extent such amount is greater than the actual costs of such options, extras or upgrades; and

(ii)    in the case of a residential or retail Unit, the Sale Price Adjustments with respect to such Unit.

For such purposes, the "**Sale Price Adjustments**" with respect to a residential or retail Unit shall be an amount, which, in the case of items (1), (2), (3) and (6) of this definition below, in the

17

aggregate shall not exceed an amount equal to ten percent (10%) of the gross sale price of such residential or retail Unit, not including options, extras or upgrades, allocable to:

(1)    customary and reasonable real estate brokerage commissions paid by Owner to parties who are not Affiliates of any Loan Party;

(2)    customary and reasonable expenses of marketing such Unit only to the extent not paid for out of proceeds of the Senior Loan or the Loan and only to the extent not provided for in the Construction Budget;

(3)    title insurance, escrow, and closing costs and fees, in each case, including attorneys fees and real property transfer taxes to the extent paid by Owner;

(4)    usual and customary proration credits to the purchaser of such Unit;

(5)    the Income Tax Allowance for such Unit; and

(6)    actual fees paid to BRA pursuant to the Land Disposition Agreement upon the sale of such Unit.

Notwithstanding anything contained herein to the contrary, in the event that Borrower sells a Unit and the Senior Loan has been repaid, all Net Sales Proceeds shall be delivered to Lender within five (5) business days following each sale and, subject to the terms of <u>Section 2.6.1</u>, shall be applied as a payment on the Loan, without Prepayment Premium or penalty (but with payment of any Exit Fee due pursuant to <u>Section 2.3</u>).

## ARTICLE 3 - CONDITIONS PRECEDENT

3.1    **Initial Disbursement**. Lender's obligation to make the Initial Disbursement of the Loan is subject to satisfaction of all of the following conditions, each of which shall be deemed satisfied or waived by Lender upon Lender's making the Initial Disbursement:

3.1.1    **No Defaults; Compliance with Loan Documents.** No default or Event of Default by any Loan Party shall have occurred under this Agreement or any of the other Loan Documents, and Owner and each other Loan Party shall have timely complied with and performed all of the covenants, agreements and obligations in all material respects under this Agreement and the other Loan Documents which by their terms are required to have been complied with and performed by such Loan Party.

3.1.2    **Senior Loan.**

(a)    Borrower shall have obtained the Senior Loan from Senior Lender. The Senior Loan shall (i) bear interest prior to default at a rate of not more than the Adjusted LIBOR (as defined in the Senior Loan Documents) plus 2.5% per annum or the Base Rate (as defined in the Senior Loan Documents) plus 1%, (ii) have a term not to exceed three (3) years, (iii) charge a loan origination fee and extension fee of not more than 1% each of the original principal amount of the Senior Loan and no other fees or premiums, (iv) permit prepayment without a

18

fee, (v) not be guaranteed by or provide for recourse to any guarantor other than the Guarantors, (vi) not be secured by any document or instrument that grants a security interest or lien in any portion of the Collateral described in the Pledge Agreement, and (vii) be secured by, among other things, a first priority mortgage/deed of trust encumbering the Property. Lender shall have received true, correct and complete copies of the Senior Loan Documents. The Senior Loan Documents shall not contain provisions cross-defaulting or cross-collateralizing the Senior Loan with any other loans (including the Loan). The Senior Loan Documents shall be satisfactory to Lender in form and substance.

(b)    All conditions precedent to the first advance under the Senior Loan shall be either satisfied or waived in writing by Senior Lender, and Borrower shall provide reasonably satisfactory evidence of the same to Lender.

(c)    Lender and Senior Lender shall have executed an Intercreditor Agreement.

3.1.3    **Loan Documents.** Lender shall have received the following Loan Documents, all in form and substance satisfactory to Lender:

(a)    the Note;

(b)    the Pledge Agreement;

(c)    such Uniform Commercial Code financing statements as Lender may require;

(d)    the Environmental Indemnity;

(e)    the Completion Guaranty;

(f)    the Carve-Out Guaranty; and

(g)    the Closing Certificate.

3.1.4    **Minimum Equity.** On the Loan Opening Date, (i) Owner shall own the Land free and clear of all liens, security interests and other encumbrances securing any loan, other than the liens, security interests and encumbrances securing the Senior Loan, and (ii) Borrower shall have contributed equity to the Project in an amount not less than $2,900,000 ("**Borrower's Equity**"), as established to Lender's reasonable satisfaction.

3.1.5    **Appraisal.** Lender shall have received a copy of an appraisal report for the Land prepared for Senior Lender by an independent MAI appraiser in accordance with the Financial Institutions Reform, Recovery and Enforcement Act and the regulations promulgated pursuant to such act. Such appraisal shall be acceptable to Lender.

3.1.6  **Title Insurance.**

(a)    Lender shall have received a copy of the Title Insurance Policy. Such title insurance policy shall be issued by the Title Company, have an effective date of the Loan Opening Date, shall otherwise be acceptable to Lender, subject only to exceptions to title approved by Lender and shall contain endorsements required by Lender including, but not limited to (a) a so-called "comprehensive endorsement", (b) a so-called "Survey" endorsement (insuring that the legal description listed on the Title Insurance Policy is the same as the property depicted on the survey), (c) a non-imputation endorsement, (d) an endorsement in the form of Exhibit F attached hereto if the Title Company is not prohibited from issuing the same in the State where the Property is located, (f) an extended coverage endorsement and (f) such other endorsements as Lender may request.

(b)    Lender shall have received a copy of a Lender's Title Insurance Policy in a form reasonably acceptable to Lender insuring the validity and priority of Lender's lien on the Collateral. Such title insurance policy shall be issued by the Title Company or another insurer acceptable to Lender, have an effective date of the Loan Opening Date, shall otherwise be reasonably acceptable to Lender.

3.1.7  **Environmental Report.**  Lender shall have received a Phase I Environmental audit of the Property from an environmental consultant chosen by Lender, and, if deemed necessary by Lender based on the results of the Phase I Environmental audit, a Phase II Environment audit.  The audit shall (a) be addressed to Lender; (b) state that Lender may rely thereon; and (c) be acceptable to Lender.

3.1.8  **Survey.**  Lender shall have received and approved a survey of the Property, dated no more than forty-five (45) days prior to the Loan Opening Date.  The survey must be prepared by a registered land surveyor in accordance with the 1999 Minimum Standard Detail Requirements for ALTA/ASCM Land Title Surveys, including to the extent practicable, Items 1, 2, 3, 4, 6, 7(a), 7(b1) 7(c), 8, 9, 10, 11, 12, 14, 15 and 16 in Table A thereof, and certified in favor of Owner, Borrower, Lender and the Title Company.  The survey shall be sufficient for the Title Company to remove the general survey exception from the Title Insurance Policy.

3.1.9  **Insurance.**  Lender shall have received evidence satisfactory to Lender that Borrower carries the insurance required by the terms of Section 5.3 of this Agreement.  Lender shall have received evidence satisfactory to Lender of the environmental insurance policy issued by AIG (the **"Environmental Policy"**), which policy shall be satisfactory to Lender and which shall name Lender as a named insured.

3.1.10  **Opinion.**  Lender shall have received an opinion from counsel for the Loan Parties in form and substance satisfactory to Lender, including an opinion as to (i) the due authorization, execution and enforceability of the Loan Documents and usury, and (ii) the Property's compliance with all applicable zoning and land use laws and the

073449.159058 DGM LIBD/1687331.11                              10/07/05 11:35 am

existence of all necessary Permits, other than those that will be issued in the ordinary course upon Completion of the Improvements.

3.1.11  **UCC, Judgment and Lien Searches.**  Lender shall have received current UCC, judgment, bankruptcy, pending litigation and tax lien searches for each of the Loan Parties.  Such searches shall be conducted in each of the locations designated by Lender and the results thereof must be satisfactory to Lender.

3.1.12  **Intentionally Deleted.**.

3.1.13  **Permits.**  Lender shall have received copies of all Permits necessary for the Property and the construction of the Improvements, including all building permits, a development plat map and any other Permits necessary for the facilities, operations, and activities conducted or to be conducted on the Property other than those that will be issued upon Completion or during the course of construction (to the extent such Permits are not required in connection with work already completed).

3.1.14  **Construction Documents.**  Lender and Lender's Consultant shall have received and approved the Construction Documents.

3.1.15  **Soil Test Report.**  Lender shall have received and approved a soil test report or reports (the "**Soil Report**") prepared by a licensed soil engineer satisfactory to Lender and containing boring logs for all borings and showing the locations of all borings, together with recommendations for the design of the foundations, paved areas and underground utilities for the Property, and confirming that no conditions exist which could cause subsidence of any portion of the Land.

3.1.16  **Additional Items.**  Lender shall have received such other items as Lender may reasonably require.

3.2  **Subsequent Disbursements.**  Lender shall not be obligated to make any disbursement to Borrower other than the Initial Disbursement unless and until all of the following conditions are satisfied:

3.2.1  **No Defaults; Compliance with Loan Documents.**  No default or Event of Default by any Loan Party shall have occurred under this Agreement or any of the other Loan Documents and Borrower and each other Loan Party shall have timely complied with and performed all of the covenants, agreements and obligations in all material respects under this Agreement and the other Loan Documents which by their terms are required to have been complied with and performed by such Loan Party.

3.2.2  **Requisition.**  Borrower, general contractor, Project Architect and, if Lender requests, Lender's Consultant shall have executed, or caused to be executed, and delivered to Lender a construction loan requisition in form and substance satisfactory to Lender, such requisition to be accompanied by appropriate supporting documentation for invoices as Lender may require.

073449.159058 DGM  LIBD/1687331.11                                    10/07/05 11:35 am

3.2.3  **Additional Documentation.**  Lender shall have received (i) evidence that there have been no adverse changes in the status of title to the Property since the previous advance, (ii) a certification from the Project Architect and, if Lender elects, Lender's Consultant stating that, in their opinion, the construction of the Improvements theretofore performed has been in substantial accordance with the Plans and all applicable Laws, (iii) lien waivers or releases (in recordable form) from the contractor under the Construction Contract and all subcontractors under Major Contracts, (iv) evidence reasonably satisfactory to Lender that all Loan proceeds previously disbursed by Lender have been used by Borrower or Owner to pay for work to complete the Improvements and (iv) such other certifications or evidence of cost and completion as Lender may reasonably request.

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

As an inducement to Lender to make the Loan, Borrower hereby represents and warrants as follows, which representations and warranties shall be true as of the date hereof and, except (i) for the representations and warranties in <u>Section 4.3</u>, <u>Section 4.5</u> and Section <u>4.9</u> (with respect to liens, encumbrances and taxes being contested in accordance with the terms of this Agreement), (ii) for representations and warranties which are stated to be as of the date hereof, and (iii) with respect to matters which have been disclosed in writing to and approved in writing by Lender, shall remain true in all material respects throughout the term of the Loan or will be made true and correct in all material respects within the cure period provided in <u>Section 8.1(d)</u>:

4.1  **Entity Existence.**  Borrower is a limited partnership, validly existing and in good standing under the Laws of the State of Delaware with its chief executive office at 6110 Executive Boulevard, Suite 312, Rockville, Maryland 20852.  Owner is a limited liability company, validly existing and in good standing under the Laws of the State of Delaware with its chief executive office at 6110 Executive Boulevard, Suite 312, Rockville, Maryland 20852. General Partner is a limited partnership, validly existing and in good standing under the Laws of the State of Texas with its chief executive office at 2001 Bryan Street, Suite 3700, Dallas, Texas 75201.  General Partner's General Partner is a corporation, validly existing and in good standing under the Laws of the State of Texas with its principal place of business at under the laws of the State of Texas with its chief executive office at 2001 Bryan Street, Suite 3700, Dallas, Texas 75201.  The Loan Documents have each been duly authorized, executed and delivered by, and each constitutes the duly authorized, valid and legally binding obligation of, each of the Loan Parties that is a party thereto, as the case may be, enforceable against each of the Loan Parties that is a party thereto, as the case may be, in accordance with their respective terms.

4.2  **Ownership and Control of Borrower.**  General Partner is the sole general partner in Borrower, and Limited Partner is the sole limited partner in Borrower. General Partner's General Partner is the sole General Partner in General Partner.  General Partner owns one hundred percent (100%) of the general partnership interests in Borrower free and clear of any and all claims, liens, encumbrances, options, warrants and other rights of any kind, except as stated in Borrower's Organizational Documents.  Limited Partner owns one hundred percent (100%) of the limited partnership interests in Borrower free and clear of any and all claims, liens, encumbrances, options, warrants and other rights of any kind, except as stated in Borrower's Organizational Documents. General Partner's General Partner owns one hundred percent (100%) of the general partnership interests in General Partner free and clear of any and all

22

claims, liens, encumbrances, options, warrants and other rights of any kind, except as stated in General Partner's limited partnership agreement. General Partner's General Partner, in its capacity as such, has and shall continue to have authority to make all material business decisions for Borrower during the term of the Loan.

    4.3    **Organizational Documents; Authority.** True, correct and complete copies of Borrower's Organizational Documents and the organizational documents of Owner, General Partner and General Partner's General Partner have been furnished to Lender. Borrower's Organizational Documents, and such other organizational documents, so delivered constitute the entire agreements relating to the organization of Borrower and Owner and remain in full force and effect. There are no other agreements, oral or written, relating to the formation or organization of Borrower or Owner. Borrower's Organizational Documents, and the organizational documents of Owner, General Partner and General Partner's General Partner, were duly executed and delivered, are in full force and effect, and are binding upon and enforceable against the parties thereto in accordance with their terms. No default exists under Borrower's Organizational Documents or Owner's organizational documents. No default exists by General Partner's General Partner under General Partner's organizational documents. No condition exists which, with the giving of notice or the passage of time, would constitute a default under Borrower's Organizational Documents or Owner's organizational documents or a default by General Partner's General Partner under General Partner's organizational documents. Borrower's Organizational Documents and Owner's organizational documents expressly recognize and permit the Pledge Agreement and any Transfers of ownership interests in Owner, Borrower or General Partner relating thereto. No organizational documents of any other Person prohibit the Pledge Agreement or any Transfer of ownership in Owner or Borrower relating thereto. Borrower's Organizational Documents and Owner's organizational documents expressly provide that any such Transfer shall not (a) cause a dissolution of Borrower or Owner, or (b) constitute a default under Borrower's Organizational Documents or the organizational documents of Owner. Each of the Loan Parties has all partnership or corporate power, statutory and otherwise, to execute and deliver this Agreement and the other Loan Documents executed by it and to perform its obligations hereunder and thereunder, all of which have been duly authorized by all necessary action.

    4.4    **Other Agreements.** The execution, delivery and compliance with the terms and provisions of this Agreement, the other Loan Documents and the Senior Loan Documents will not (a) violate any provisions of any applicable Laws, or (b) conflict or be inconsistent with, or result in any default under, any material contract, agreement or commitment by which any Loan Party is bound. Borrower has delivered to Lender true, complete and correct copies of all material agreements among Borrower or Owner on the one hand and any Guarantor and/or any Affiliate of any Guarantor on the other hand that is binding on Borrower or Owner and related in any significant way to the Property and all other material agreements or documents creating obligations or rights relating to the development, construction, ownership, management, leasing of the Property, including agreements with any Governmental Authorities binding upon Borrower, Owner or any Guarantor or any Affiliate of any of the foregoing with respect to the Property or otherwise binding upon the Property.

    4.5    **Property.** Good and marketable fee simple title to the Land is owned by Owner free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security

interests and claims of others, except for exceptions listed on Schedule 4.5 attached hereto (the "**Encumbrances**"). Subject to Section 3.1.13, Owner has obtained or Borrower will cause Owner to obtain all Permits necessary for the Property and the construction of the Improvements, including all building permits and any other Permits necessary for the use, facilities, operations, occupancy and activities conducted or to be conducted on the Property, other than those that will be issued in the ordinary during the course of construction of the Improvements or upon Completion of the Improvements. The Land is, and the Property when the Improvements are Completed will be, in compliance with all Laws (including zoning requirements, land use Laws, access requirements and building codes) and all covenants, conditions and restrictions of record. The Property is not a non-conforming use or a legal non-conforming use. The zoning approval of the Property and the right and ability to construct, use or operate the Improvements are not in any way dependent on or related to any real estate other than the Land. There are no, nor are there any alleged or asserted, violations of Laws or other obligations or agreements relating to any portion of the Property or the construction or use thereof.

4.6    **Property Access.** The Land is accessible through a perpetual, recorded access easement set forth in the Deed dated May 21, 1979 recorded in Book 9182, Page 165 and in Deed dated July 7, 1978 recorded in Book 9182, Page 149 leading to fully improved and dedicated roads accepted for maintenance and public use by the public authority having jurisdiction.

4.7    **Utilities.** All utility services necessary and sufficient for the construction, use or operation of the Property are available at the boundary of the Land, including water, storm sewer, sanitary sewer, gas, electric and telephone facilities. Unconditional written permission has been obtained from the applicable utilities or municipalities, as the case may be, to connect the Improvements with each of such services.

4.8    **Flood Hazards/Wetlands.** The Land is not situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973, as amended, or as a wetlands by any governmental entity having jurisdiction over the Land, or, if it is situated in a special flood zone, Owner carries and maintains adequate flood insurance coverage for the Property.

4.9    **Taxes/Assessments.** There are no unpaid or outstanding real estate or other taxes or assessments on or against the Property or any part thereof, except general real estate taxes not yet due or payable. Real estate tax bills with respect to the Property have not yet been issued. Such bills, upon issuance, will cover the entire Property and will not cover or apply to any other property. As of the date hereof, there is no pending or, to Borrower's knowledge, threatened or contemplated action pursuant to which any special assessment may be levied against any portion of the Property.

4.10    **Eminent Domain.** As of the date hereof, there is no eminent domain or condemnation proceeding pending or, to Borrower's knowledge threatened or contemplated, relating to the Property.

4.11    **Litigation.** As of the date hereof, except as set forth in Exhibit D attached hereto, there is no litigation, arbitration or other proceeding or governmental investigation pending or, to

24

Borrower's knowledge, threatened against or relating to Borrower or Owner or any of their property, assets, or businesses, including the Property and the Collateral, which if decided adversely might affect the business, affairs, assets or financial condition of Borrower or Owner, the Property, the Collateral, the lien or the priority of the Pledge Agreement or the other Loan Documents, the prospects for repayment of the Loan or the performance of any other obligations of Borrower or Owner under any of the Loan Documents.

4.12    **Senior Loan.** Borrower has furnished Lender with a true, correct and complete copy of the Senior Loan Documents. All of the representations and warranties of Owner, any Guarantor or Borrower, or any Affiliate of any of the foregoing, under the Senior Loan Documents are accurate, true and correct in all material respects as of the date hereof. There is no "event of default" under any of the Senior Loan Documents, and, as of the date hereof, no condition exists which, with the giving of notice or the passage of time, would constitute a default under any of the Senior Loan Documents.

4.13    **No Additional Indebtedness.** Except for the indebtedness created by the Loan Documents and the Senior Loan Documents, neither Owner nor Borrower has incurred additional indebtedness, except for trade payables in the ordinary course of business and obligations under interest rate hedges related to the Senior Loan.

4.14    **Accuracy.** Neither this Agreement nor any Loan Document nor any other document, financial statement, credit information, certificate or statement furnished to Lender by or on behalf of Borrower or any other Loan Party on or before the date hereof contains, as of the date hereof, any untrue statement of a material fact or omits to state a material fact which would affect Lender's decision to make the Loan. To Borrower's knowledge, no document, financial statement, credit information, certificate or statement furnished to Lender by or on behalf of Borrower or any other Loan Party from and after the date hereof shall, when delivered, contain any untrue statement of a material fact or omit to state a material fact which would affect Lender's decision to make the Loan.

4.15    **Foreign Ownership.** None of Borrower, Limited Partner or any Loan Party is or will be, and no direct interest in Borrower or any other Loan Party is or will be held by, a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of Code Sections 897 and 1445, the Foreign Investments in Land Tax Act of 1980, the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

4.16    **ERISA.** None of Borrower's or Owner's assets constitutes or will constitute Plan Assets. Neither Borrower nor any other Loan Party has ever maintained, contributed to or provided benefits under an employee benefit plan that has been subject to Title IV of ERISA or Code Section 412 or ERISA Section 302, including but not limited to any "multiemployer plan" (as such term is defined in ERISA Section 3(37)). No Loan Party and none of their affiliates (within the meaning of Part V(c) of PTE 84-14) has the authority to appoint or terminate Lender as investment manager of any assets of the Western Conference of Teamsters Pension Trust Fund or to negotiate the terms of any management agreement with Lender on behalf of the

073449.159058 DGM LIBD/1687331.11                                          10/07/05 11:35 am