# Exhibit I

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                           SUPERIOR COURT DEPARTMENT
                                                       CIVIL ACTION NO.

TURNER CONSTRUCTION COMPANY
          Plaintiff,

v.

NAVY YARD FOUR ASSOCIATES LIMITED
PARTNERSHIP, A DELAWARE LIMITED
PARTNERSHIP, NAVY YARD FOUR
ASSOCIATES, LLC, TCR NORTHEAST
CONSTRUCTION, INC., A TEXAS
CORPORATION, TCR NORTHEAST
APARTMENTS, INC., A TEXAS
CORPORATION, TCR NORTHEAST
CONDOMINIUM, INC., A TEXAS
CORPORATION, TCR NAVY YARD FOUR
ASSOCIATES LIMITED PARTNERSHIP, A
TEXAS LIMITED LIABILITY
PARTNERSHIP, PRUDENTIAL INSURANCE
COMPANY OF AMERICA, A NEW JERSEY
CORPORATION, EUROHYPO AG, NEW
YORK BRANCH, A GERMAN NON-
REGISTERED COMPANY.
          Defendants.

## COMPLAINT

NOW COMES Turner Construction Company with this Complaint.

### PARTIES

1. Turner Construction Company (hereinafter "TCC") is a New York corporation with a principal place of business, in Massachusetts, at Two Seaport Lane, Boston, Massachusetts.

2. Navy Yard Four Associates Limited Partnership, a Delaware Limited Partnership has a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas and also has an office 15 Old Danbury Road, Suite 100, Wilton, Connecticut.

3. TCR Northeast Apartments, Inc. is a Texas corporation, which is the General Partner of Navy Yard Four Associates Limited Partnership and has a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas.

4. TCR Navy Yard Four Limited Partnership is the general partner of Navy Yard Four Associates Limited Partnership and has a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas.

5. TCR Northeast Condominiums, Inc. is a Texas corporation and is the General Partner of TCR Navy Yard Four Limited Partnership and has a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas.

6. TCR Apartments Inc. is a Texas corporation which has a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas.

7. Upon information and belief, Navy Yard Four Associates Limited Partnership is the manager of Navy Yard Four Associates, LLC.

8. TCR Northeast Construction, Inc. is a Texas corporation with a principal place of business at 2001 Bryan Street, Suite 3700, Dallas, Texas and an additional place of business at 15 Old Danbury Road, Suite 100, Wilton, Connecticut. TCR is also known as Trammell Crow Residential. Upon information and belief, TCR is a national real estate development company and it has offices throughout the country, as well as an office at 160 Gold Street, Suite 1221, Needham, Massachusetts.

9. Prudential Insurance Company of America, a New Jersey corporation, (hereinafter "Prudential") with the usual place of business at 213 Washington St., 9th Floor, Newark, New Jersey.

10. Eurohypo AG, New York Branch (hereinafter "Eurohypo"), upon information and belief, is a branch of Eurohypo Aktiengesellschaft, a German corporation, with a principal place of business in the United States at 1114 Avenue of the Americas, 29th Floor, New York, New York. Upon information and belief, Eurohypo is not authorized to do business in Massachusetts.

11. Given the extraordinary number of related entities, all TCR related entities will be described as TCR. All Navy Yard Four entities will be described as NYFA, except as otherwise described.

## FACTS

12. On or about July 11, 2005, TCC as a Construction Manager entered into a Construction Management Agreement with General Conditions ("CMA") with Navy Yard Four Associates, Limited Partnership, described in the CMA as the "Owner" of a project located at parcel 4, Charlestown Navy Yard with an address 250 First Avenue, Charlestown, Massachusetts (hereinafter the "Project"), for the construction of approximately 225 residential condominium units.

13. The CMA, as amended, required that TCC build the Project for a Guaranteed Maximum Price of $91,485,000.00 (plus all approved change orders) for the construction of the Project.

14. Upon information and belief, the NYFA entities are closely associated with and/or related to TCR. Upon information and belief, TCR shares the same address and suite number and personnel as NYFA.

15. Upon information and belief, TCR and/or NYFA entered into a loan agreement with Eurohypo in order to fund the construction of the Project ("Eurohypo Construction Loan").

16. Upon information and belief, the Eurohypo Construction Loan was in the amount of $94,098,000.00 and was secured by a Mortgage and Security Agreement recorded at the Suffolk County Registry of Deeds in book 38288, page 311.

17. Prior to, or shortly after, the commencement of the work on the Project by TCC, TCC sought assurance from NYFA and TCR that NYFA and/or TCR had they actual funds sufficient to insure that the $91,485,000.00 (the Guaranteed Maximum Price) was available to fund the construction of the Project.

18. NYFA in order to further cause TCC to be assured of the availability of funds to pay TCC in full under the terms of CMA, advised TCC that it allegedly entered into a separate loan arrangement with Prudential, where Prudential described itself as a "Mezzanine Lender" and had allegedly loaned Navy Yard Four Associates Limited Partnership $17,000,000.00. Upon information and belief, a review of the Suffolk County Registry of Deeds reveals no recording of the Prudential Mortgage to Navy Yard Four Associates Limited Partnership in any amount.

19. Based upon the assurance of NYFA and TCR, the Defendants convinced TCC that there was over $111,098,000 ($17,000,000 plus $94,098,000) was available to fund the CMA.

20. Upon TCC's requesting evidence of the availability of such funds, NYFA forwarded to TCC the top page of the Eurohypo Construction Loan Mortgage. NYFA and TCR assured TCC that the Eurohypo Construction Loan Mortgage was evidence of sufficient funds to pay the entire CMA plus any approved change orders.

21. Upon information and belief, the representation by NYFA and TCR that the Eurohypo Construction Loan insured the payment of the CMA in full was materially false, misleading, unfair and deceptive, since upon information and belief, the Eurohypo Construction Loan contained provisions requiring a substantial amount of the Eurohypo Construction Loan to be paid back to Eurohypo as interest on the Loan, rendering it insufficient to pay the CMA in full.

22. Based upon the receipt of the assurance of NYFA and TCR of the sufficiency of available funds, TCC commenced construction of the Project which proceeded on time and within budget, subject to approved change orders, to substantial completion of the Project on or about July 18, 2007 (hereinafter the "Completion Date").

23. On the Completion Date, TCC turned over to NYFA the entire building, i.e. 224 residential condominium units, Warranties on each unit, all manuals and back-up information for all equipment in the units and the building, as well as for all appliances, and machinery. In addition, TCC turned over all "as-built drawings," and complied with all other requirements of the CMA.

24. Upon information and belief, Eurohypo, although it was not authorized to do business in Massachusetts, during the construction, regularly visited the Project site, reviewed the Project progress, reviewed and approved monthly requisitions on the Eurohypo Construction Loan, participated in building "walk throughs", regularly made

photographic evidence of the progress of the construction, reviewed and approved contractor's and subcontractors' requisitions, and was supplied by TCC with detailed information concerning TCC's compliance with the budget and schedule, the percentage of completion of the Project for every requisition, and TCC's schedule of values. As a result, Eurohypo was aware of what funds would be needed to complete the Project at every requisition stage from the inception of the construction to the substantial completion of the Project.

25.  At all times relevant to the construction, Prudential and/or its agents regularly visited the site, reviewed the Project for Code compliance, walked the Project site, walked every floor of the building and was supplied with detailed information concerning TCC's compliance with the budget and schedule, and the percentage of completion for every requisition period and schedule of values for every requisition period. Upon information and belief, Prudential was aware of what funds would be needed to complete the Project, from the inception of the Project through every requisition period until the substantial completion.

26.  Upon information and belief, during the construction, TCR and NYFA were unable to sell the condominium units on a pre-construction basis.

27.  Upon information and belief, approximately only 19 potential buyers of units made offers to purchase (hereinafter the "Offers to Purchase") with NYFA during the pre-construction or construction. NYFA and TCR were unable to obtain Offers to Purchase on the remaining 205 units.

28.  At all times from the commencement of the construction to Substantial Completion, TCC was required to move forward in the construction and NYFA and TCR

made payments to TCC in accordance with the terms of the CMA until July of 2007 when payment ceased.

29. Upon information and belief, NYFA and TCR's failure to enter into Offers to Purchase for the 224 units resulted in NYFA's default on Eurohypo and Prudential causing loans. Said defaults were not disclosed to TCC until July of 2007.

30. Upon information and belief, NYFA and TCR met with Prudential and Eurohypo in December, 2006/January, 2007 and, without approval of TCC, elected to stop all sales efforts of condominium units, as well as elected to negate, void or otherwise invalidate the 19 Offers to Purchase that had been signed for units in the Project. In addition, NYFA and TCR closed the marketing office at the Project, thus, ending all efforts by the Owner to sell the condominium units as individual units.

31. Upon information and belief, the decision by NYFA and TCR was discussed with and approved by Eurohypo and Prudential, notwithstanding the fact that the decision not to sell the condominium units would have resulted in NYFA and TCR being in material default under the terms of the Eurohypo and Prudential loans.

32. During and after January, 2007 through July, 2007, TCC, with the knowledge and encouragement of NYFA, TCR, Prudential and Eurohypo, continued construction under the terms of the CMA and completed the Project.

33. In June, 2007, TCC was informed that NYFA and TCR were seeking to sell the Project as "an apartment building" rather than as residential condominium units.

34. Upon information and belief, Eurohypo, Prudential, TCR and NYFA conspired with each other to cause TCC to continue construction, when Eurohypo, Prudential, TCR and NYFA knew that, as a result of the defaults by NYFA and TCR,

Eurohypo and Prudential would not fund the entire amount of the CMA, even while they knew that TCC was relying to their assurances to the contrary.

35. Shortly after the Completion Date, TCC was informed by NYFA and TCR that Eurohypo had informed NYFA and TCR that they were in default on the Eurohypo Construction Loan Mortgage and that said default required that NYFA and TCR contribute $10,000,000 to Eurohypo in order for Eurohypo to pay TCC what was due and owing on outstanding requisitions. NYFA and TCR refused to contribute the $10,000,000 because NYFA, TCR, Eurohypo and Prudential were all aware that the $10,000,000 worth of work was completed and that they all would benefit from not lending, borrowing, or not paying TCC for the $10,134,993 worth of work.

36. Upon information and belief, Eurohypo's and Prudential's decision to not fund the costs of the Project completion was made deliberately and in bad faith based upon their refusal to put NYFA into default until the Project had been completed by TCC. That decision insured that Eurohypo would cause TCC to provide approximately $10,000,000 worth of work, which would add to the value of the Project when Eurohypo had known for approximately eight (8) months that it would not pay for such work.

37. On or about June 27, 2007, TCC submitted the June requisition for its work along with a lien waiver issued under the provisions M.G.L. c. 254.

38. Eurohypo and Prudential refused to fund the June requisition even though Eurohypo and Prudential were aware that they had accepted the requisition and that NYFA and TCR took the possession of the Project, took possession "as-built drawings," manuals warranties etc. for all equipment and machinery in the Project.

39. On July 31, 2007, TCC submitted its July requisition along with a lien waiver.

40. During June, July and August, 2007, Eurohypo and Prudential, either directly or thought their agents, participated with TCR and NYFA, in establishing work schedules and "punch lists" to be performed by TCC in spite of the fact that Eurohypo, Prudential, NYFA and TCR were fully aware that they had no intention of paying TCC the remaining portion of the CMA.

41. Eurohypo, Prudential, TCR, and NYFA continued to hold in excess of 2,085,644.00 in retainage for work done and completed by TCC. Such withholding of the retainage is in violation of Massachusetts law. Eurohypo, Prudential, TCR and NYFA knew that the retainage was not going to be paid to TCC while Eurohypo, Prudential, TCR and NYFA continually gave assurances to the contrary.

42. On October 4, 2006, in compliance with M.G.L. c. 254, TCC filed a Notice of Contract establishing a mechanic's lien on the Project.

43. On August 6, 2007, TCC filed a Statement of Account in compliance with M.G.L. c. 254.

44. The filing of the instant Complaint with this Court and the simultaneous filing of the Complaint in the Suffolk County Registry of Deed perfects TCC's lien under the provisions of M.G.L. c. 254.

### COUNT I
(Contract)
(NYFA)

45. TCC repeats and realleges the allegations set forth in paragraphs 1 through 44 above and incorporates them by reference as fully set forth herein.

46. TCC has substantially completed the requirements of the CMA.

47. NYFA has asserted no off-sets or back-charges against TCC, nor can it.

48. TCC is owed $10,134,993.00 which represents the unpaid CMA's amount and approved change orders plus retainage.

49. Under the provisions of the CMA, Section 4.6.1., NYFA and TCC are required to arbitrate any dispute. TCC will arbitrate in compliance with the terms of the CMA.

50. Under the provision 4.4.3 of the CMA, TCC may file this Complaint in accordance with M.G.L. c. 254 in order to perfect the TCC's lien, prior to moving forward in the arbitration with NYFA.

51. Without waiving TCC's requirements to arbitrate under the provisions of the CMA, TCC asserts that NYFA, with the involvement of TCR, knew NYFA did not have sufficient funds to pay TCC, materially changed the Project, and deliberately ensured that TCC would not be paid, and withheld that information from TCC so as to cause TCC to provide $10,134,993 in material and services where NYFA knew that it (1) would not pay TCC; (2) knew it would not borrow the $10,134,993 to pay TCC; and (3) participated with Prudential and Eurohypo, in causing TCC to materially increase the value of the Project to the extreme detriment of TCC. TCC asserts that NYFA materially defaulted by its actions and that such default voids TCC's obligation to arbitrate its dispute with NYFA.

52. TCC intends to initiate arbitration for the limited purpose of establishing that no arbitration requirement exists or is applicable to TCC where NYFA's material default has voided such requirement.

## COUNT II
(Contract)
(All TCR entities)

53. TCC repeats and realleges the allegations set forth in paragraphs 1 through 52 above and incorporates them by reference as fully set forth herein.

54. TCR has assumed a significant role with the Owner of the Project but has not signed any contract with TCC and therefore, TCC has no obligation to mediate or arbitrate its claims with TCR.

55. TCC regularly participated in meetings with TCR's personnel. TCR uses the same address and offices as NYFA.

56. TCR has given repeated assurances of payment, directly to TCC, as if TCR was the Owner and TCR has participated with the other Defendants in causing TCC to continue to provide $10,134,993 worth of work, when TCR knew that TCC would not be paid but withheld that information from TCC.

57. TCR, by fraudulently inducing TCC to provide $10,143,993 in construction services to the benefit of NYFA and TCR, in violating its duty of good faith and fair dealing to TCC.

58. TCC has been damaged thereby.

## COUNT III
(Quantum Meruit)
(TCR, NYFA, Eurohypo, and Prudential)

59. TCC repeats and realleges the allegations set forth in paragraphs 1 through 58 above and incorporates them by reference as fully set forth herein.

60. TCR, NYFA, Eurohypo, and Prudential deliberately and willfully caused TCC to perform $10,134,993 worth of work on the Project and derived the benefit from that work without paying TCC.

61. TCC has been damaged thereby.

## COUNT IV
(Unjust Enrichment)
(TCR, NYFA, Eurohypo, and Prudential)

62. TCC repeats and realleges the allegations set forth in paragraphs 1 through 61 above and incorporates them by reference as fully set forth herein.

63. TCR, NYFA, Eurohypo, and Prudential deliberately and willfully caused $10,134,993 worth of work to be performed on the Project and were unjustly enriched by such work.

64. TCC has been damaged thereby.

## COUNT V
(M.G.L. c. 93A)
(TCR, NYFA, Eurohypo, and Prudential)

65. TCC repeats and realleges the allegations set forth in paragraphs 1 through 64 above and incorporates them by reference as fully set forth herein.

66. TCR, NYFA, Eurohypo, and Prudential are in the trade or business of construction, development, residential sales, and construction lending.

67. Upon information and belief, Eurohypo has threatened to foreclose on the Project for the purpose of taking priority over TCC's M.G.L. c. 254 mechanic's lien.

68. Eurohypo, which was operating in Massachusetts in violation of Massachusetts law, aware that the terms of its own loan documentation deliberately refused to fund construction that it knew was occurring and did so in order to unfairly and

deceptively add $10,134,993 of value to the Project, and to unfairly and deceptively cause TCC to deliver Warranty, Certificates of Occupancy, Certificates of Completion, Warranty Manuals, "as-built drawings" etc., where the delivery of such benefits added materially to the value of the Project and added to the ability of Eurohypo to recover a larger percentage of its loan amount upon its threatened foreclosure. Upon information and belief, Eurohypo, unfairly and deceptively caused TCC to perform $10,134,993 worth of work and had done so in belief that the foreclosure by Eurohypo would prevent TCC from recovery under its mechanic's lien.

69. Prudential, aware of the terms of its own loan documentation with NYFA, deliberately refused to fund construction that it knew was occurring and did so unfairly and deceptively in order to unfairly and deceptively add $10,134,993 of value to the Project, and to unfairly and deceptively cause TCC to Warranty, Certificates of Occupancy, Certificates of Completion, Warranty Manuals, "as-builts drawings" etc., where the delivery of such benefits added materially to the value of the Project and added to the ability of Prudential to recover its loan amount.

70. NYFA and TCR unfairly and deceptively, in collusion and/or in conspiracy with the other Defendants, sought to avoid to borrowing the amount sufficient to pay TCC in full, and caused TCC to do the work even though NYFA and TCR fully expected that Eurohypo would foreclose and that such foreclosure would inure to the benefit of NYFA in the amount of $10,134,993. Upon information and belief, NYFA is a single purpose limited liability partnership which has no assets other than the Project which is encumbered by the loans and mechanic's liens.

71. TCC has been damaged thereby.

## COUNT VI
(Civil Conspiracy)
(TCR, NYFA, Eurohypo, and Prudential)

72. TCC repeats and realleges the allegations set forth in paragraphs 1 through 71 above and incorporates them by reference as fully set forth herein.

73. TCR and its related entities, and Navy Yard Four Associates Limited Partnership and its related entities, Eurohypo and Prudential have deliberately conspired by and between themselves to cause TCC to provide $10,134,993 of work on the Property, when the Defendants knew that they would not pay for such work and that the Defendants knew that TCC was unaware of such conspiracy.

74. Upon information and belief, Prudential, through a pledge from various Defendants, succeeds to the rights of the Owner upon the default the Owner or related entities, and as such, may have or may become the Owner and therefore, has direct benefit from the conspiracy of all Defendants.

75. TCC has been damaged thereby.

## PRAYERS FOR RELIEF

WHEREFORE, TCC respectfully requests that this Court:

1. After trial, order that all Defendants immediately pay a total of $10,134,993 under the terms of the CMA.

2. After trial, order that all Defendants pay treble damages ($30,404,979) plus attorney's fees, interest and costs under the provisions of M.G.L. c. 93A.

3. After trial, or at such time as this Court may deem appropriate, that this Court find that Eurohypo and Prudential acted unfairly, deceptively, and fraudulently in order to increase the value of the Project, to the detriment of

TCC and that, as a result, the Mortgage of Eurohypo be equitably subordinated to the Judgment entered by this Court in favor of TCC, including all treble damages, attorney's fees, costs and expenses.

4. After trial, find that the TCR and all related entities cannot benefit from the protection of Massachusetts law relating to separate corporate identities, since the TCR entities are, in effect, created for the purpose of fraudulently attempting to avoid liabilities, while simultaneously entering into unfair and deceptive strategies, which have resulted in damages to TCC.

5. After trial, find that Defendants have deliberately conspired by and among themselves to cause TCC to provide $10,134,993 of additional work on the Project and that such conspiracy resulted in joint and several liability to each participant of the conspiracy, to full amount of this Court Judgment in favor of TCC, as such Judgment may be trebled and as this Court may award attorney's fees, costs and expenses.

### JURY DEMAND

TCC hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Turner Construction Company

By Its Attorney,

*/s/ Michael C. McLaughlin*

Michael C. McLaughlin (BBO#337350)
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
Telephone: (617) 227-2275

Dated: August 31, 2007